**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Twan J. JAMES, Ernest Parker, Reginald G. Allison, Yvonne R. Ferguson, and Walter Williams, Defendants–Appellants.**

Nos. 93–1708, 93–1724, 93–1798, 93–1855 and 93–1954.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 6, 1993.

Decided Nov. 1, 1994.

As Amended Nov. 1, 1994.

Certiorari Denied in No. 93– 1954 Jan. 23, 1995.

See 115 S.Ct. 948.

Chris R. Larsen, Asst. U.S. Atty. (argued), Rodney Cubbie, Milwaukee, WI, for U.S.

David E. Lowe (argued), Hachey & Lowe, Milwaukee, WI, for Twan J. James.

Glen B. Kulkoski (argued), Carr, Kulkoski & Carr, New Berlin, WI, for Ernest Parker.

Christopher Lowe (argued), Milwaukee, WI, for Reginald G. Allison.

Thomas M. Croke (argued), Brookfield, WI, for Yvonne R. Ferguson.

Charles W. Jones, Jr., Michael A. Yamat (argued), Jones & Associates, Milwaukee, WI, for Walter L. Williams.

Before KANNE and ROVNER, Circuit Judges, and CURTIN, District Judge.*

ILANA DIAMOND ROVNER, Circuit Judge.

Following a jury trial, Twan J. James, Ernest Parker, Reginald G. Allison, Yvonne R. Ferguson, and Walter Williams were each convicted of conspiring to possess with intent to distribute cocaine. In addition, James, Allison, and Williams were convicted of conspiring to possess and of possessing heroin with the intent to distribute, and of using a firearm in relation to their drug trafficking offenses. James, who has a previous felony conviction involving narcotics, was also found guilty of possession of a firearm by a felon.

* The Honorable John T. Curtin, of the Western District of New York, sitting by designation.

On appeal, the defendants raise several challenges to their convictions, and Allison and Williams also challenge their sentences.

## I. FACTS

*The Early Operations of the Conspiracy*

The conspiracy began in early 1990, in Milwaukee, Wisconsin. At that time, Marvin Linnear ("BK"), Earnest Parker ("Tookie"), and Parker's girlfriend Carolyn Ward began selling heroin and cocaine from Ward's residence at 3433 North Fifth Street in Milwaukee. Linnear supplied Parker with heroin and with kilogram quantities of cocaine, and Parker and Ward then packaged the drugs for distribution. By the early summer of 1990, Glen James ("G") joined Parker, Linnear, and Granvel Windom in selling cocaine and heroin from a house located at 2125 North Palmer Street, also in Milwaukee. Charles Shaw, who is Ward's cousin, sold the drugs at Linnear's direction at the Palmer Street house, and witnessed approximately $2,500 to $3,000 worth of narcotics distributed from the house on a daily basis. Shaw received $500 per day from Linnear in exchange for selling heroin and cocaine. Shaw's involvement with the Palmer Street drug house ended with his arrest at the house on August 24, 1990, by the Milwaukee police. Shaw was held for several days, then released without prosecution.

Upon his release, Shaw began selling heroin and cocaine with Windom at yet another drug house in Milwaukee, which was operated by a man known only by the nickname of "Gordy." Several days later, Linnear, Glen James, and Walter Williams took over operations of that house and told Shaw they no longer needed his assistance. Shaw then briefly frequented a drug house located at First and Wright Streets in Milwaukee, which was operated by Ward and by Glen James' brother, Twan J. James ("Dog"). Shaw did not participate in distributing cocaine and heroin from the Wright Street drug house, and soon stopped visiting the house.

*The Search of 2179 North 45th Street*

During the summer of 1991, Shaw sold cocaine on the street in front of a Milwaukee apartment building located near 800 North 23rd Street. Purchasers of the drug would drive up or walk up to Shaw to obtain their supply. His source for the cocaine was Glen James. On July 30, 1991, at approximately 5:45 p.m., Shaw telephoned a tip to the Milwaukee police that illegal drugs were being "bagged up" in the upper flat of a duplex located at 2179–81 North 45th Street in Milwaukee, and that "G" (Glen James) was doing the bagging. (Dec. 10, 1992 Tr. at 83–84.) Six police officers, all in plainclothes, went to the residence to investigate. Because the officers did not believe they had probable cause to support a search warrant at that time, they decided to follow a "knock and talk" procedure. Upon arriving at the duplex, they planned to knock on the door, announce that they were police officers, and request to speak with the occupants concerning the complaint of drug trafficking that had been received.

When they reached the duplex, Officer William Hammerling, Detective Edward Liebrecht and Officer Michael Lewandowski went to the rear side door of the first floor of the duplex. At that time, the officers believed that the alleged drug trafficking was taking place in the second floor flat, and they hoped to find someone on the first floor who would open the rear door of the building and allow them access to the second floor without alerting the people inside. (Dec. 8, 1992 Tr. at 108.) As they were walking along a paved walkway to the rear side door, Detective Liebrecht looked into a set of windows on the side of the building. He saw a dining room in which four men were seated around a glass-top table. Detective Liebrecht had a clear view of the objects on the table, and saw a mechanical coffee grinder, a dinner plate containing a large mound of white powder, a handgun, and two foil wrappers. (Dec. 8, 1992 Tr. at 108–09.) All four of the men appeared to be doing something with their hands, but Detective Liebrecht could not be certain what they were doing. (Dec. 8, 1992 Tr. at 109–10.) One of the men, who was later determined to be Twan James, looked up and spotted Detective Liebrecht. He then got up from the table, grabbed a plastic bag with silver items in it, and ran from the

dining room. A second man, who turned out to be Williams, grabbed the two foil wrappers from the table and also fled the room. Detective Liebrecht told Officer Hammerling that there were drugs and guns in the first floor residence, and Officer Hammerling began knocking on the rear side door and announcing that they were police officers. At the same time, Detective Liebrecht and Officer Lewandowski saw Williams run out of the duplex onto a second-floor porch, and ordered him to go back inside the building. Officer Hammerling then forced open the rear side door and entered the first floor residence with Officer Lewandowski and Officer Gary Temp.

When Officer Hammerling entered the residence, he saw Glen James and Twan James standing in the kitchen next to a large steel sink. The faucet of the sink had been opened and the water was running full force. He also heard the sounds of running water and of a flushing toilet in another part of the flat. Officer Hammerling told the James brothers to raise their hands over their heads and face the wall. He then walked through the dining room and came upon the bedroom door, where he saw Reginald Allison standing in the doorway as if he had just left the bedroom. (Dec. 9, 1992 Tr. at 56–57.) He also discovered a Ruger .44 caliber semiautomatic rifle propped up against the wall of the bedroom. After bringing Allison to the kitchen, he continued to search the first floor of the duplex for other people. As he walked back through the dining room, he observed several items on the dining room table, including a nine-millimeter semiautomatic pistol, a digital electronic scale, a coffee grinder, several bottles containing mannitol, a cutting agent commonly used in preparing cocaine and heroin for street distribution, three cellular telephones, several beepers, and plastic baggies and tin foil.

In the meantime, Officer Lewandowski went to the upper floor of the duplex and found Williams hiding in a closet in the attic. He too was arrested and brought to the kitchen. Officer Carol M. Starr confiscated the nine-millimeter pistol and the .44 caliber rifle, both of which proved to be loaded.

Detective Liebrecht searched the bedroom for other suspects or weapons, and discovered a leather coat hanging in the closet. Inside a pocket of the coat, he found a plastic bag containing seventy-three tinfoil packets of heroin. (Dec. 9, 1992 Tr. at 27.) Suspecting that illegal drugs were being destroyed in the bathroom, Detective Liebrecht disconnected the water supply pipe and removed the entire toilet to examine it. Not having equipment with which to examine the contents of the pipe leading from the toilet, Detective Liebrecht was unable to determine whether drugs or paraphernalia had already been flushed and had made their way further down the pipe. Glen James, Twan James, Allison, and Williams were then searched. Williams, who produced a false California driver's license identifying him as Dwayne Tutt, was carrying $1,550 in cash; Glen James and Twan James had in their possession $640 and $3,534 in cash, respectively. All four were later released.[1]

On August 20, 1991, police were summoned to 2179 North 45th Street by the building manager, Anton Cizel. Earlier that day, a maintenance man had reset the toilet that had been removed by Detective Liebrecht during the July 30, 1991 investigation. When the toilet failed to operate properly, the maintenance man determined that something was obstructing the drain pipe and causing the toilet to back up. Using a hand snake to clear the drain pipe, he retrieved a plastic bag containing small tinfoil packets that had been caught in the pipe. The maintenance man gave the bag to Cizel, who then turned it over to police.

*Earnest Parker's Telephone Calls to Coconspirators*

Between November 1991 and June 1992, prison officials at the United States Penitentiary in Lompoc, California, tape-recorded a series of telephone conversations between Earnest Parker and Thomas Hightower, Glen James, and Carolyn Ward. In the course of these conversations, Parker discussed the status of the conspiracy with Ward and Hightower, offering advice on how it should be managed and criticism of Glen

1. The record is unclear as to why the defendants were released at that time.

James' reluctance to share a larger part of the proceeds from the sale of cocaine and heroin with the other members of the conspiracy. At one point, Parker suggested to Hightower that Glen James' avarice be reported to Williams and Linnear. Parker also made arrangements with Glen James to have heroin and cocaine delivered to him at the penitentiary, where he found ready customers. Parker sent a portion of the money he made distributing these drugs to Ward.

### The Arrests of Glen and Twan James

On March 18, 1992, Agents Diane Roberts and Jose de Arteaga of the Wisconsin Division of Probation and Parole, accompanied by members of the Milwaukee County Sheriff's Department, arrived at 3383 North Second Street in Milwaukee, to investigate a reported parole violation on the part of Jean Wilbourn involving controlled substances. After Wilbourn, Andre Robertson and others present in the house were handcuffed, the agents began their search. While the agents were searching for illegal narcotics, Glen James came to the door carrying a brown grocery bag with an American flag and an Operation Desert Storm slogan on it. As soon as Glen James perceived that his friends were handcuffed, he turned and fled, abandoning the grocery bag under a nearby car. The grocery bag, which was identified and retrieved by Agent Arteaga and then turned over to Detective Eugene Welch, contained three plastic bags filled with slightly more than 750 grams of cocaine. In making his escape, Glen James also left behind a white 1984 Chevrolet Super Sport, which was impounded by sheriff's deputies. A motor vehicle purchase contract found in the car revealed that Glen James had purchased it in February 1992, under the alias of Donald Stewart. Based on information provided by Detective Welch, a federal warrant for Glen James' arrest soon issued.

In August 1992, Agent Scott Perala of the Bureau of Alcohol, Tobacco and Firearms (ATF) received information that Glen James was living in an apartment building located at 4558 North 27th Street in Milwaukee. On August 18, 1992, Agent Perala, accompanied by Detective Robert Stelter and other members of the Milwaukee police department,

arrived at the building and were allowed to enter Apartment 4 by Nanette Brown, Glen James' girlfriend. While in the apartment, Detective Stelter noticed that the back door leading to the basement was slightly ajar. He and two other police officers went down to the basement where they found Glen James hiding behind the furnace. The officers handcuffed Glen James and placed him under arrest. Having noticed a semiautomatic handgun lying next to the bed in the bedroom, as well as several electronic beepers and a large amount of cash strewn across the dresser, the officers decided to request a search warrant for Apartment 4. They were waiting for the warrant to issue when Twan James entered the apartment through a rear door, using a key. As soon as the officers identified themselves, Twan James began to fight with Detective Stelter. He was quickly subdued, then placed under arrest.

The ensuing search of Apartment 4 yielded approximately $113,000 in cash, including over $30,000 found in Glen James' bedroom, and $36,080 and $38,920 found in two money belts retrieved from Twan James' bedroom. The money belts bore the fingerprints of Glen and Twan James. In their search of Twan's bedroom, the officers also recovered a Taurus nine-millimeter semiautomatic handgun and an "AG" .25 caliber semiautomatic pistol, both of which were loaded, a bottle of inositol, which is a common cutting agent used in narcotics trafficking, two scales, three electronic beepers, and several pieces of identification bearing the name of Kevin Wilson, an alias used by Twan James. A key ring containing keys that corresponded to various locks in the apartment was confiscated from Twan.

### Yvonne R. Ferguson's Role in the Conspiracy

On March 7, 1992, Yvonne R. Ferguson arrived in Jackson, Mississippi, where she contacted Clementine Denise Rushing and asked Rushing to help her to purchase some guns as gifts, claiming that she needed Rushing's assistance because she lacked a Mississippi identification card. (Dec. 9, 1992 Tr. at 142.) Rushing agreed, and the two women visited four different gun stores and pawn shops, purchasing one gun in each shop.

Ferguson picked out the guns and paid for them in cash, and Rushing completed the paperwork as though she were the purchaser. (Dec. 9, 1992 Tr. at 149–51, 156–60.) Ferguson then bought some gift wrapping paper and asked Rushing to take the guns home with her and wrap them. Rushing wrapped the guns and delivered them to Ferguson. On March 20, 1992, in Milwaukee, Wisconsin, ATF Agents Perala and Dave Darin arrested Granvel Windom while he was driving an automobile the agents recognized as belonging to Glen James. A search of the automobile revealed a number of packets of heroin and cocaine and a loaded nine-millimeter Browning highpower semiautomatic pistol that had been placed on the floorboard under the front seat. (Dec. 14, 1992 Tr. at 130–34.) Agent Perala traced the pistol back to its retailer and established that it was one of the four guns purchased by Rushing at Ferguson's behest in Jackson, Mississippi. (Dec. 14, 1992 Tr. at 134–36.)

On August 20, 1992, Officer David Hinman of the Glendale, Wisconsin police department received a report from a confidential informant of suspicious activity occurring in Room 327 of the Exel Inn, located on Port Washington Road. Officer Hinman was familiar with the hotels on Port Washington Road because at times they had been the scene of narcotics abuse. When he arrived at the door of Room 327, he heard a female voice screaming and crying, "Leave me alone, don't touch me." (Oct. 30, 1992 Tr. at 10; Dec. 10, 1992 Tr. at 165.) Officer Hinman then requested a back-up squad, which arrived fifteen minutes later. He approached the door of Room 327 with two uniformed police officers, knocked on the door and announced his presence. The female voice responded that she was undressed and that the officers should wait until she put her clothes on. Several minutes later, Ferguson opened the door and allowed the police officers to enter. Once inside, Officer Hinman observed a .22 caliber bullet sitting on the nightstand, and a man who turned out to be Thomas Hightower lying in bed. Hightower, who identified himself as John L. Bryant (one of his numerous aliases), seemed to be fully clothed, yet had the covers pulled up to mid-chest. He also had two pillows under his head and a sweatshirt stuffed under the pillows. At that point, Officer Hinman became concerned that a gun might be present in the room. He told Hightower to sit up, then retrieved the sweatshirt, patted it down, and found that it concealed $6,500 in cash and a .22 caliber Derringer handgun.

Officer Hinman handcuffed Hightower and asked the other two police officers to handcuff Ferguson. As the officers attempted to handcuff Ferguson, she screamed that "the needles are sticking me." (Dec. 10, 1992 Tr. at 172; Oct. 30, 1992 Tr. at 20.) One of the police officers removed three hypodermic needles from the waistband of her slacks. One of the needles contained a brownish liquid that Ferguson confirmed was heroin. Officer Hinman asked Ferguson if any other illegal narcotics were present in the room, and she told him to go ahead and search the room, as it did not contain any other drugs. A thorough search of the room revealed two boxes of .357 caliber bullets, a Skytel pager, a fully loaded nine-millimeter Beretta semiautomatic handgun hidden under the mattress of the bed where Hightower had been lying, and two bundles of cash totalling $66,500. The nine-millimeter Beretta proved to be one of the four guns Ferguson had purchased in Jackson, Mississippi on March 7, 1992. Officer Hinman also uncovered a paper bag containing four receipts for money orders that had been purchased by Don Stewart, an alias used by Glen James.[2] Several address books, note pads and a pocket calendar were retrieved from Ferguson's purse. These contained the names of Glen and Twan James and addresses and telephone numbers of other members of the conspiracy, including Parker, Ward, and Linnear. Before leaving the hotel room, Ferguson asked to speak to Officer Hinman in private, outside of Hightower's earshot. In an apparent reference to Glen and Twan James, Ferguson told Officer Hinman that she would be able to provide the police with

---

**2.** As noted above, Glen James had previously used the alias of Donald Stewart to purchase a car.

information concerning two members of the Los Angeles Crips gang that had recently been arrested in Milwaukee. (Oct. 30, 1992 Tr. at 22–23; Dec. 10, 1992 Tr. at 182.)

Ferguson was taken to the Glendale Police Department and placed in a holding cell. At approximately 2:30 a.m. on August 21, 1992, she called out to Officer Hinman and asked him whether the police had been to her apartment. When Officer Hinman replied that they had not, she told him that if the police were to search her apartment, they would find two kilograms of cocaine and a quantity of heroin. (Oct. 30, 1992 Tr. at 25; Dec. 10, 1992 Tr. at 184.) Officer Hinman then asked Ferguson if she would consent to a search of her apartment, and she replied, "Yeah; it's [the drugs] not mine; they're stashing it at my place." (Dec. 10, 1992 Tr. at 184.) Two hours later, Officer Hinman removed Ferguson from her holding cell and placed her in the rear of his squad car, where she remained handcuffed while Officer Hinman met with several members of the Glendale and Milwaukee police departments to organize the search. Officer Oscar Perez asked Ferguson to reconfirm her consent to the search of her apartment. She signed a memo book in Officer Perez' presence, stating that she had agreed to the search. (Oct. 30, 1992 Tr. at 58–61; Dec. 11, 1992 Tr. at 18–19.) Ferguson also gave the officers keys to her apartment and information concerning its floor plan and stated that a gang had been using it for the purpose of "stashing" narcotics. (Dec. 11, 1992 Tr. at 19–21.) The search of Ferguson's apartment yielded 11.52 grams of heroin packaged in six separate plastic baggies, twenty-five small plastic bags each containing one rock of cocaine base, a digital gram scale, inositol, an ammunition clip for a pistol, and two shotgun shells.

## II. ANALYSIS

A. *Twan J. James*

■ Twan J. James was found guilty of conspiracy to possess with intent to distribute in excess of five kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846, and 18 U.S.C. § 2 (Count 1 of the superseding indictment), conspiracy to possess with intent to distribute heroin in violation of the same statutes (Count 2), possession of heroin with intent to distribute, also in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count 3), two counts of using or carrying a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1) (Counts 4 and 17), and of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count 15). He was sentenced to a total of 451 months of imprisonment and five years of supervised release. On appeal, James asserts that the government produced insufficient evidence for a jury to conclude that he used or possessed the "AG" .25 caliber semiautomatic pistol retrieved on August 18, 1992 in relation to a drug trafficking crime. James also joins Reginald G. Allison in challenging the district court's denial of their motions to suppress evidence obtained during the warrantless search of the duplex located at 2179 North 45th Street in Milwaukee, Wisconsin.

1. Sufficiency of the Evidence—Count 17

■ Twan James asserts that the evidence linking him with the "AG" .25 caliber automatic pistol recovered from his bedroom in the apartment located at 4558 North 27th Street was insufficient to sustain his conviction for using a firearm in relation to a drug trafficking crime. James bears a heavy burden. A conviction is supported by sufficient evidence if, when viewing the evidence in the light most favorable to the government, we are able to conclude that a rational jury could have found each of the essential elements of the offense beyond a reasonable doubt. *United States v. Carson,* 9 F.3d 576, 582 (7th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 135, 130 L.Ed.2d 77 (1994). To prove that James violated 18 U.S.C. § 924(c)(1), the government was required to show: (1) that James "used or carried" a firearm, and (2) that he did so "during and in relation to" his participation in the drug distribution conspiracy. *Smith v. United States,* —— U.S. ——, ——, 113 S.Ct. 2050, 2053, 124 L.Ed.2d 138 (1993); *United States v. Villagrana,* 5 F.3d 1048, 1051 (7th Cir.1993). "The phrase 'in relation to' thus, at a minimum, clarifies that the firearm must have some purpose or effect with respect to the drug trafficking

crime; its presence or involvement cannot be the result of accident or coincidence." *Smith,* — U.S. at ——, 113 S.Ct. at 2059. Thus, a firearm is "used ... during and in relation to" a drug distribution conspiracy if the firearm is within the possession or control of the coconspirator and its possession aids in the accomplishment of the conspiracy's objective. *Id.* (the gun "must facilitate or have the potential of facilitating the drug trafficking offense") (citation, internal quotations omitted); *see also Villagrana,* 5 F.3d at 1051–52; *United States v. Ocampo,* 890 F.2d 1363, 1371 (7th Cir.1989).

■ The government produced ample evidence from which a rational factfinder could conclude that Twan James possessed the .25 caliber pistol, including evidence that the pistol was confiscated from James' bedroom and that James had ready access to the apartment in which the pistol was found. *See United States v. Garrett,* 903 F.2d 1105, 1109–11 (7th Cir.), *cert. denied,* 498 U.S. 905, 111 S.Ct. 272, 112 L.Ed.2d 227 (1990).[3] Moreover, the government demonstrated that the pistol was loaded and kept in close proximity to the tools of James' drug distribution trade (scales, electronic beepers, and a bottle of cutting agent) and that the bedroom where the pistol was found also contained approximately $75,000 in cash. Having concluded that James was a member of an ongoing narcotics conspiracy, a reasonable jury could have inferred that the large sum of cash found in his bedroom represented proceeds from drug sales and that James kept the pistol in the bedroom for the purpose of protecting the money. *See Villagrana,* 5 F.3d at 1051–52 (firearm found in coconspirator's bedroom, in close proximity to drug paraphernalia and other evidence that he packaged cocaine there, permitted inference that the firearm was used in connection with drug trafficking); *United States v. Curry,* 911 F.2d 72, 80 (8th Cir.1990) (large sums of unexplained cash found in proximity to other evidence of drug trafficking permits inference that cash came from drug transactions),

*cert. denied,* 498 U.S. 1094, 111 S.Ct. 980, 112 L.Ed.2d 1065 (1991). The use of firepower to protect money obtained from drug trafficking does, of course, increase the likelihood that the aim of the conspiracy will be accomplished. *Villagrana,* 5 F.3d at 1051–52; *United States v. Woods,* 995 F.2d 713, 718 (7th Cir.1993); *United States v. Bafia,* 949 F.2d 1465, 1475–76 (7th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1989, 118 L.Ed.2d 586 (1992). The evidence produced by the government is therefore sufficient to support the jury's verdict that James used the pistol to facilitate his drug trafficking crime.

### 2. Motion to Suppress

■ James joins Allison in arguing that the search of the duplex violated his Fourth Amendment rights. James argues that the warrantless search of the duplex was not justified by exigent circumstances because the officer who first perceived the contraband on the dining room table did so from a vantage point in which he was not lawfully situated. He also contends that even if the officers' entry of the duplex was justified by exigent circumstances, their search and seizure of the packets of heroin found in a jacket hanging in the bedroom closet violated the Fourth Amendment. His arguments fail.

■ First, James contends that because Detective Liebrecht had already violated James' Fourth Amendment rights by invading the curtilage of the duplex when he saw the contraband on the table through the dining room window, the "exigent circumstances" exception justifying the warrantless search of the duplex does not apply. *See Horton v. California,* 496 U.S. 128, 136, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990) ("an essential predicate to any valid warrantless seizure of incriminating evidence [is] that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed"). As the district court established at the hearing on

---

3. In *Garrett,* police officers confiscated a loaded weapon from the floor of the driver's side of a station wagon. 903 F.2d at 1107–08. The court determined that the defendant's use of a set of keys to enter the vehicle constituted sufficient evidence to prove that he possessed the gun. *Id.* at 1110–11.

the motion to suppress, Detective Liebrecht and the other officers arrived at 2179–81 North 45th Street believing that drugs were being packaged for distribution on the upper floor flat. Upon arriving, they decided to find out whether the lower floor was occupied as well and whether the lower floor residents would be able to provide them with more information concerning the alleged illegal activities occurring on the upper floor. In their attempt to reach the lower floor residents, they used a paved walkway along the side of the duplex leading to the rear side door. The passage to the rear side door was not impeded by a gate or fence. Both the paved walkway and the rear side door were accessible to the general public and the rear side door was commonly used for entering the duplex from the nearby alley. As the Ninth Circuit recently observed, where the back door of a residence is readily accessible to the general public, the Fourth Amendment is not implicated when police officers approach that door in the reasonable belief that it is a principal means of access to the dwelling. *United States v. Garcia,* 997 F.2d 1273, 1279–80 (9th Cir.1993); *see also United States v. Daoust,* 916 F.2d 757, 758 (1st Cir.1990) (collecting cases).[4] Because Detective Liebrecht therefore did observe the contraband from a location in which he was lawfully situated and because he saw that upon noticing him James immediately tried to conceal or destroy the contraband, the officers' warrantless entry into the lower floor flat was justified by exigent circumstances. *See Ker v. California,* 374 U.S. 23, 39–40, 83 S.Ct. 1623, 1633, 10 L.Ed.2d 726 (1963); *United States v. de Soto,* 885 F.2d 354, 358, 368 (7th Cir.1989) (officers' warrantless entry of apartment was justified by their reasonable belief that the occupants would attempt to destroy evidence of cocaine trafficking); *see also United States v. Talkington,* 843 F.2d 1041, 1044 (7th Cir.1988) (exi-

gent circumstances doctrine "applies to situations where the nature of the evidence is evanescent and the agents fear its imminent destruction") (citing *Ker,* 374 U.S. at 39–40, 83 S.Ct. at 1633).

■ James further contends that even if the officers' entry of the flat was reasonable, their discovery of seventy-three tinfoil packets of heroin concealed in the pocket of a jacket hanging in the bedroom closet was not justified by exigent circumstances or by any other exception to the warrant requirement. The Supreme Court has consistently held that a warrant must be obtained prior to searching a person's residence, unless "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona,* 437 U.S. 385, 394, 98 S.Ct. 2408, 2414, 57 L.Ed.2d 290 (1978) (citations, internal quotations omitted). Such exigent circumstances exist when police officers reasonably believe that preserving their own safety or the safety of others compels swift action and that they therefore cannot wait to obtain a warrant. *Id.* at 392, 98 S.Ct. at 2413; *Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 1949–50, 56 L.Ed.2d 486 (1978); *United States v. Ware,* 914 F.2d 997, 1000 (7th Cir. 1990). A warrantless search based on exigent circumstances may extend no further than necessary to preserve safety or prevent the imminent destruction of evidence and so "must be 'strictly circumscribed by the exigencies which justify its initiation.'" *Mincey,* 437 U.S. at 393, 98 S.Ct. at 2413 (quoting *Terry v. Ohio,* 392 U.S. 1, 25–26, 88 S.Ct. 1868, 1882, 20 L.Ed.2d 889 (1968)); *see also Horton,* 496 U.S. at 139–40, 110 S.Ct. at 2309–10.

■ We conclude that given the totality of the circumstances facing Detective Liebrecht at the time that he and the other

---

4. We are unpersuaded by James' contention that *Daoust* is distinguishable because the officers in that case found the front door inaccessible before going to the back of the house. 916 F.2d at 758. The court in *Daoust* determined that the officers looked up through a kitchen window "simply to see if someone was at home" and not for the purpose of collecting evidence of a crime. *Id.* The fact that the officers attempted to reach

Daoust first by knocking on the front and cellar doors provided strong support for the officers' contention that they had a legitimate law enforcement motive for looking through the kitchen window. The court did not, however, imply that police officers seeking to interview a person are always required to knock on the front door of a residence before they may approach any other public means of access to the dwelling. *See id.*

officers entered the duplex, Detective Liebrecht acted reasonably in opening the door of the bedroom closet, searching the jacket, and seizing the contraband it contained. At the time of the search, Detective Liebrecht knew that the lower floor of the duplex contained illegal narcotics, drug paraphernalia, and two loaded firearms, one of which had been confiscated from the bedroom. He also knew that there were at least four suspects in the flat, and that one of the suspects, Williams, had attempted to flee by way of the upper floor of the duplex. He could thus deduce that there was an easy means of access between the two floors, and he could not be certain that all of the occupants of the duplex had been accounted for and secured. Another suspect, Allison, who had been arrested immediately outside the bedroom door, was observed leaving the bedroom where the .44 caliber semiautomatic rifle was found. Two other suspects, Twan and Glen James, were in the process of destroying evidence when they were apprehended. As in *United States v. Foxworth*, 8 F.3d 540 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1414, 128 L.Ed.2d 85 (1994), "[t]he police were not acting within a controlled environment, . . . [but were] facing circumstances that were rapidly progressing and, for the most part, out of their control." *Id.* at 544. At the time Detective Liebrecht acted, he did not know if all of the suspects in the duplex had been subdued. It was thus reasonable for him to enter the bedroom near which Allison had just been arrested, open the bedroom closet door (*see Maryland v. Buie*, 494 U.S. 325, 334, 110 S.Ct. 1093, 1098, 108 L.Ed.2d 276 (1990)) and, upon seeing the leather jacket, to make certain that it did not contain any weapons that could be turned against the officers.[5] *See Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1645–46, 18 L.Ed.2d 782 (1967).[6] Detective Liebrecht's cursory search of the jacket immediately revealed the plastic bag containing the seventy-three tinfoil packets of heroin. Because the plastic bag containing the packets of heroin was therefore uncovered during the course of a lawful search and its incriminating character was immediately apparent, Detective Liebrecht's seizure of the bag did not violate the Fourth Amendment. *See Horton*, 496 U.S. at 135–37, 110 S.Ct. at 2307–08. James' motion to suppress the evidence was therefore properly rejected.

## B. *Ernest Parker*

■■■■■ Ernest Parker was found guilty of conspiracy to possess with intent to distribute in excess of five kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1) & 846 and 18 U.S.C. § 2 (Count 1) and was sentenced to 420 months in prison and five years of supervised release. Parker argues that because he was not physically present in Milwaukee during the duration of the conspiracy, having been incarcerated in the federal prison in Lompoc, California on unrelated charges, the evidence presented by the government of recorded telephone conversations between Parker and his coconspirators was insufficient to prove that he was a mem-

---

5. Detective Liebrecht's limited search of the jacket for additional weapons is thus easily distinguishable from the four-day warrantless search of an entire apartment which the Supreme Court condemned in *Mincey*, 437 U.S. at 393, 98 S.Ct. at 2413–14. We also believe that the circumscribed search in this case does not present the danger of "enlarg[ing] a specific authorization, furnished by [exigent circumstances], into the equivalent of a general warrant to rummage and seize at will." *Minnesota v. Dickerson*, —— U.S. ——, ——, 113 S.Ct. 2130, 2138, 124 L.Ed.2d 334 (1993) (citation, internal quotations omitted).

6. In *Hayden*, the Supreme Court held that, where police had been informed that an armed robbery had taken place only minutes earlier, "[t]hey acted reasonably when they entered the house [into which the suspect had fled] and began to search for a man . . . and for weapons which he had used in the robbery or might use against them." 387 U.S. at 298, 87 S.Ct. at 1646. Because of the pressing need to ensure that the police had control of all of the weapons in the house, the Court upheld the search of a jacket and trousers that the suspect had worn during the armed robbery and then hid in a washing machine. *Id.* at 298–300, 87 S.Ct. at 1645–46. In our case, Detective Liebrecht's search of the jacket in the bedroom closet was similar to the police officer's search for weapons in *Hayden*, which included the opening of a washing machine and the examination of the clothing it contained. *See id.; see also United States v. Mason*, 966 F.2d 1488, 1492–93 (D.C.Cir.) (citing *Hayden*), *cert. denied*, —— U.S. ——, 113 S.Ct. 829, 121 L.Ed.2d 699 (1992).

ber of the conspiracy. Parker's argument is without merit.

█ To prove that Parker was a member of the cocaine distribution conspiracy, the government was required to show that Parker knew of the conspiratorial agreement and intended to join it. *See United States v. Goines*, 988 F.2d 750, 759 (7th Cir.), *cert. denied*, —— U.S. ——, ——, ——, 114 S.Ct. 241, 483, 558, 126 L.Ed.2d 195 (1993). The government's evidence of Parker's knowledge and intent rested primarily on intercepted communications. The fact that his conversations with the coconspirators in Milwaukee took place while he was in California has no bearing on whether the evidence presented was sufficient to convict him of conspiracy.[7] As evidence of Parker's involvement in the conspiracy, the government offered the testimony of Charles Shaw, who testified that prior to his incarceration Parker had participated in the sale of heroin and cocaine with Glen James, Carolyn Ward, and other members of the conspiracy. Shaw's testimony was highly probative of whether Parker knew that the conspiracy existed, particularly in light of Parker's testimony that he was unaware of the meaning of certain terms used by the coconspirators in referring to narcotics. After establishing that Parker had played a role in the inception of the conspiracy, the government produced sixty-four tape recordings of intercepted telephone conversations between Parker and Hightower, Glen James, and Ward. These tape-recorded conversations provided the jury with substantial evidence from which it could reasonably conclude that while incarcerated at Lompoc, Parker arranged drug transactions with coconspirators in Milwaukee and sought to influence the division of proceeds from drug sales among his coconspirators. *See United States v. O'Connell*, 841 F.2d 1408, 1426 (8th Cir.1988) (intercepted telephone calls demonstrated that defendant arranged drug transactions while in prison and thus knowingly contributed to furtherance of conspiracy), *cert. denied*, 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 893 (1988), 488 U.S. 1011, 109 S.Ct. 799, 102 L.Ed.2d 790 (1989). The jury was, moreover, entitled to reject Parker's testimony that he was unaware of the true import of the numerous code words used by Hightower and Ward in referring to drug dealing and that his own apparent references to narcotics distribution—including his complaint to Ward about the poor quality of the drugs that he was distributing in the penitentiary—had an innocent explanation. *See United States v. Fort*, 998 F.2d 542, 546 (7th Cir. 1993); *Goines*, 988 F.2d at 758. Parker's challenge to the sufficiency of the evidence therefore fails.

### C. *Reginald G. Allison*

█ Allison was found guilty of conspiring to possess with intent to distribute in excess of five kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1) & 846 and 18 U.S.C. § 2 (Count 1), conspiring to possess with intent to distribute heroin, also in violation of §§ 841(a)(1) & 846 and § 2 (Count 2), possession of heroin with intent to distribute in violation of § 841(a)(1) and § 2 (Count 3), and one count of using or carrying a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1) (Count 4). He was sentenced to three concurrent terms of 168 months in prison as to Counts 1, 2 and 3, a consecutive term of 60 months in prison with respect to Count 4, and five years of supervised release. Allison challenges his conviction on the following grounds: (1) the government failed to produce sufficient evidence for a jury to reasonably conclude that Allison was guilty of the crimes charged in Counts 1, 2, 3 and 4 of the superseding indictment; (2) the search of the duplex at 2179 North 45th Street was conducted in violation of his Fourth Amendment rights and its fruits should have been suppressed; and (3) the district court erred in denying his motion in limine to exclude from evidence the tinfoil packets of heroin retrieved from the toilet at the duplex three weeks after the initial search. Allison also challenges his

---

**7.** *See, e.g., United States v. Marshall*, 985 F.2d 901, 905 (7th Cir.) (evidence of coconspirator's presence in a city where he was shown to have directed others to distribute cocaine is not essential to his conviction), *cert. denied*, —— U.S. ——, 113 S.Ct. 2445, 124 L.Ed.2d 662, —— U.S. ——, 114 S.Ct. 102, 126 L.Ed.2d 69 (1993).

sentence on the ground that the district court erred in relying on the inconsistent testimony of Glen James to conclude that Allison was responsible for distributing twenty-one kilograms of cocaine. Allison further asserts that the court erred in concluding that he should be held accountable for the quantities of narcotics transported by coconspirators Ward and Ferguson. The issues raised by Allison's appeal of the district court's denial of his motion to suppress have already been addressed and require no further discussion. We shall consider the remaining issues in turn.

### 1. Sufficiency of the Evidence—Counts 1 and 2

Allison argues that the evidence produced by the government to show that he conspired with others to distribute cocaine and heroin was insufficient to convict him of these charges and that the government's case rests on no more than Allison's mere presence at the duplex on the day of his arrest. In evaluating a challenge to the sufficiency of the evidence, we review the record in the light most favorable to the government, granting it the benefit of all reasonable inferences that may be drawn from the evidence. *Fort*, 998 F.2d at 545; *Goines*, 988 F.2d at 758. To prove that a particular defendant was a member of an ongoing conspiracy, the government must present "substantial evidence that [the] defendant knew of the illegal objective of the conspiracy and agreed to participate in its achievement." *United States v. Burrell*, 963 F.2d 976, 987 (7th Cir.), cert. denied, — U.S. —, 113 S.Ct. 357, 121 L.Ed.2d 270 (1992). The government may prove Allison's participatory link to the conspiracy solely by way of circumstantial evidence. *United States v. Townsend*, 924 F.2d 1385, 1390 (7th Cir.1991); *United States v. Durrive*, 902 F.2d 1221, 1225 (7th Cir.1990). Allison is correct in pointing out that "the jury's verdict may not rest solely on the piling of inference upon inference." *United States v. Martinez*, 937 F.2d 299, 304 (7th Cir.1991) (internal quotations, citations omitted). In order to sustain the jury's verdict against a sufficiency challenge, however, the government's case need not exclude every reasonable hypothesis of innocence as long as

the evidence, when viewed in its totality, permits a conclusion of guilt beyond a reasonable doubt. *Burrell*, 963 F.2d at 988, 996–97; *see also United States v. Duarte*, 950 F.2d 1255, 1260 (7th Cir.1991), cert. denied, — U.S. —, 113 S.Ct. 174, 121 L.Ed.2d 120 (1992); *Martinez*, 937 F.2d at 304. Although "mere knowledge of, approval of, association with, or presence at a conspiracy is insufficient to establish ... participation," *Durrive*, 902 F.2d at 1225, a defendant's presence at the scene where coconspirators acted in furtherance of the conspiracy's ultimate objective is a probative factor which may be considered with other factors in assessing the sufficiency of the evidence. *Burrell*, 963 F.2d at 988; *United States v. Maltos*, 985 F.2d 743, 746 (5th Cir.1992). Thus, although presence alone is not sufficient to convict a defendant of conspiracy, " '[p]resence or a single act will suffice ... if the circumstances permit the inference that the presence or act was intended to advance the ends of the conspiracy.' " *Carson*, 9 F.3d at 587 (quoting *United States v. Pazos*, 993 F.2d 136, 140 (7th Cir.1993) (citation, internal quotations omitted)).

Allison does not dispute that the government established that at the time he was alleged to have joined the conspiracy, Glen James, Twan James, and Williams were members of an ongoing conspiracy to distribute cocaine and heroin. As evidence that Allison joined his alleged coconspirators in the agreement to distribute these narcotics, the government offered the testimony of Detective Liebrecht. Detective Liebrecht testified that he observed Allison seated at a dining room table with the three other men at 2179 North 45th Street, and that the table contained a plate with a mound of white powder, drug paraphernalia, and a handgun. Detective Liebrecht further testified that all four of the men appeared to be doing something with their hands. As soon as one of the men spotted him, they all scattered, Twan James carrying a plastic bag with small tinfoil wrappers in it, and Williams carrying two foil wrappers. When the officers entered the duplex, the occupants began destroying the suspected narcotics and other paraphernalia. The officers were neverthe-

less able to recover two loaded firearms, a foil wrapper, a scale, a coffee grinder, and several bottles of mannitol, one of which was empty. The officers also confiscated seventy-three tinfoil packets of heroin from the jacket hanging in the bedroom closet, and a plastic bag containing ninety-one similar packets was later retrieved from the pipe beneath the toilet. The jury heard expert testimony that coffee grinders and the mannitol are typically used to cut cocaine and heroin (Dec. 9, 1992 Tr. at 70–72, 87), and that foil wrappers such as the one recovered are used to store and transport kilogram quantities of uncut cocaine. (Dec. 9, 1992 Tr. at 79–81.) Further expert testimony established that the presence of cellular telephones, electronic pagers, and two loaded firearms supported an inference that the drugs on the premises were intended for distribution. (Dec. 9, 1992 Tr. at 85–87; Dec. 15, 1992 Tr. at 102–03, 106–07, 113.)

In his challenge to the sufficiency of the evidence, Allison relies heavily on this court's opinion in *Goines,* 988 F.2d at 750, in which one of thirteen codefendants was acquitted of conspiring to distribute cocaine. The court in *Goines* determined that evidence of a single transaction in which a defendant, Kenneth Smith, purchased a quantity of cocaine from an unindicted coconspirator merely supported the conclusion that Smith had a buyer-seller relationship with a member of the conspiracy, not that he joined coconspirators in the agreement to distribute cocaine. *Id.* at 764. In holding that the evidence against Smith was insufficient to implicate him in the conspiracy, the court stated that "[n]o evidence of trust or any mutual benefit supports an inference of conspiracy from the simple sale of cocaine from [a coconspirator] to Smith." *Id.*

We believe that the court's observation in *Goines* that the evidence failed to demonstrate the existence of "trust," or of a mutually beneficial relationship (beyond that of mere buyer and seller) between Smith and members of the conspiracy is significant and serves to underscore the difference between that case and Allison's. In determining whether circumstantial evidence is sufficient to support the inference that a particular defendant was a member of a conspiracy, courts have considered whether the defendant's acts rendered support to coconspirators, whether the defendant was entrusted with some task that furthered the criminal design, or whether he entered into a mutually cooperative relationship with coconspirators that assisted them in bringing about the object of the conspiracy. *See id.* at 760, 764; *Burrell,* 963 F.2d at 988–89; *see also Townsend,* 924 F.2d at 1391, 1393–94. In this respect, certain overt acts, such as serving as a lookout or bodyguard during drug transactions, *see Pazos,* 993 F.2d at 139; *Burrell,* 963 F.2d at 993–94, or as a courier in the transportation of quantities of drugs, *see United States v. Diaz,* 876 F.2d 1344, 1354 (7th Cir.1989), are distinguishable from the mere purchase of narcotics from a member of the conspiracy. An overt act of counter-surveillance to ensure that a drug deal takes place, or of delivering drugs to a key member of the distribution network, permits a rational jury to conclude that the parties involved agreed to work together to achieve the conspiracy's criminal aim. *See generally Townsend,* 924 F.2d at 1392–95. Similarly, obtaining drugs on credit from members of a conspiracy evinces a relationship of trust and mutual cooperation, which in turn supports the inference that the person engaging in credit transactions with coconspirators has a personal stake in the success of the conspiracy itself. *United States v. Baker,* 1 F.3d 596, 597 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 412, 126 L.Ed.2d 359 (1993); *United States v. Saunders,* 973 F.2d 1354, 1360 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1026, 122 L.Ed.2d 171 (1993). In each of these cases, the nature of the overt act supported the conclusion that the actor knew "that the success of those at each level [of the distribution chain] hinge[d] upon the success of others and therefore cooperate[d] for their mutual benefit." *Townsend,* 924 F.2d at 1391. The packaging of drugs for street sale is a crucial step in achieving the coconspirators' common goal of distributing the drugs. Thus, proof that a defendant participated in packaging drugs that were obtained by members of the conspiracy and were destined for further distribution by co-

conspirators may be sufficient to establish that the defendant joined the conspiracy.

We believe that when viewed in its totality, the evidence was sufficient to allow a reasonable jury to infer that Allison was not "merely present" at the duplex while the narcotics were being packaged, but that he had joined his alleged coconspirators in packaging drugs for distribution. Although the police officers did not actually see Allison weighing, cutting and placing cocaine and heroin in the tinfoil packets found at the scene, the circumstantial evidence of his participation was more than minimally sufficient to support the inference that Allison was packaging the drugs for the purpose of distribution. *Cf. United States v. Soto*, 959 F.2d 1181, 1185 (2d Cir. 1992).[8] We also conclude that this overt act was sufficient to permit the jury to convict Allison of conspiring with Glen and Twan James and Williams to distribute cocaine and heroin. *See Carson*, 9 F.3d at 587 (single act of counter-surveillance during drug transaction is sufficient to establish that the defendant joined the conspiracy); *Pazos*, 993 F.2d at 139–40 (same). Allison's challenge to the sufficiency of the evidence that he joined the conspiracy therefore fails.

2. Sufficiency of the Evidence—Count 3

Allison also asserts that the evidence was insufficient to prove that he possessed heroin with the intent to distribute. He contends that, at most, the evidence supported an inference that he was briefly present in the bedroom from which the heroin was later recovered, and that the government provided no evidence to link him with the drug. We disagree.

To convict Allison of possession with intent to distribute heroin, the government was required to prove that Allison (1) knowingly possessed heroin, and (2) intended to distribute it. *See United States v. Marin*, 7 F.3d 679, 688 (7th Cir.1993), *cert. de-*

*nied*, —— U.S. ——, 114 S.Ct. 739, 126 L.Ed.2d 702 (1994). In order to demonstrate possession, the government need only show that Allison had a level of control over the heroin that meets the standard of constructive possession. *See Martinez*, 937 F.2d at 305 (citing *United States v. Grier*, 866 F.2d 908, 930 (7th Cir.1989)). "To prove constructive possession in narcotics cases, the government must show that the defendant had the ability to exercise control over the narcotics, that is, the power to possess them." *United States v. Navarez*, 954 F.2d 1375, 1381 (7th Cir.1992) (internal quotations, citations omitted). Evidence of dominion or control over the premises where the narcotics are concealed may also support an inference of constructive possession. *United States v. Galiffa*, 734 F.2d 306, 316 (7th Cir.1984). Moreover, although association with others who possess narcotics is not, by itself, sufficient to prove that a particular defendant constructively possessed the drugs with the intent to distribute them, the defendant's association with those who possess the drugs coupled with "evidence linking the accused to an ongoing criminal operation of which that possession is a part" is sufficient. *United States v. Boykins*, 9 F.3d 1278, 1283 (7th Cir.1993) (quoting *United States v. Dunn*, 846 F.2d 761, 763–64 (D.C.Cir.1988)) (citation, internal quotations omitted). Indeed, where the government has established that a particular defendant is a member of a drug distribution conspiracy, that defendant may be convicted of narcotics possession if there is sufficient evidence from which a reasonable jury could conclude that he " 'was one of a group of conspirators who jointly controlled the narcotics.' " *Navarez*, 954 F.2d at 1382 (quoting *United States v. Camargo*, 908 F.2d 179, 184 (7th Cir.1990)).

In arguing that his mere presence in the bedroom where the heroin was concealed is insufficient to prove that he constructively

---

8. In *Soto*, the court upheld the defendant's conviction for possession of cocaine with the intent to distribute on the ground that the evidence established his presence at a crack packaging station "under a particular set of circumstances that provided a reasonable jury with ample grounds to conclude that [the defendant] was present ... to package crack for distribution."

959 F.2d at 1185. Significantly, the court observed that in light of the total evidence presented, the jury "could have reasonably determined that only trusted members of the operation would be permitted entry into the apartment." *Id.* We believe that the same reasoning applies to Allison and serves to support the conclusion that he joined the conspiracy.

possessed the heroin or even knew it was there, Allison asks us to ignore the fact that he was found guilty of conspiring to possess with intent to distribute heroin. Because there was sufficient evidence to establish that Allison was a member of the conspiracy to possess heroin and that he had been packaging drugs for distribution immediately before the heroin was confiscated, the jury could also infer that Allison knew of the heroin hidden in the bedroom closet. *See Boykins,* 9 F.3d at 1283; *Dunn,* 846 F.2d at 763–64. At the moment of his arrest at the door of the bedroom, Allison was in a position to assert "dominion and control" over the drug. *See, e.g., Galiffa,* 734 F.2d at 316. Indeed, because the evidence was sufficient to prove that the coconspirators together had the power to possess the heroin, it was sufficient to prove that Allison did as well. *See Navarez,* 954 F.2d at 1382. There was, moreover, sufficient circumstantial evidence to support the inference that the heroin was destined for street sale and that Allison, together with his coconspirators, had the ability to control its distribution. *See id.* at 1381–82; *see also Dunn,* 846 F.2d at 764. Allison's challenge to his conviction for possession with the intent to distribute heroin is therefore rejected.

### 3. Sufficiency of the Evidence—Count 4

■ Allison also challenges the sufficiency of the evidence in support of his conviction for using or carrying a firearm in relation to his possession of heroin, again contending that his conviction rests on no more than his mere presence in the duplex where the nine-millimeter semi-automatic pistol and the .44 caliber Ruger semiautomatic rifle were found. Allison also points out that no fingerprints or other evidence was introduced at trial to link him with the weapon.

■ As discussed above, § 924(c)(1) prohibits using or carrying a firearm "during and in relation to" the possession with intent to distribute heroin that resulted in Allison's conviction on Count 3 of the superseding indictment. *Smith,* —— U.S. at ——, 113 S.Ct. at 2053; *Woods,* 995 F.2d at 717. The "use" element of the offense " 'includes the possession of a firearm which in any manner

facilitates the execution of a felony.' " *Villagrana,* 5 F.3d at 1051 (quoting *Ocampo,* 890 F.2d at 1371); *see Smith,* —— U.S. at ——, 113 S.Ct. at 2059. Thus, a drug dealer who keeps a firearm "in strategic proximity" to narcotics uses it in relation to a drug trafficking crime for purposes of § 924(c)(1). *Woods,* 995 F.2d at 718 (citation omitted). "The government is only obliged to show that the firearm was available to provide protection to the defendant in connection with his engagement in drug trafficking; a showing that the weapon was used, handled or brandished in an affirmative manner is not required." *Id.* (quoting *United States v. Cooper,* 942 F.2d 1200, 1208 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1303, 117 L.Ed.2d 524 (1992)) (citation, internal quotations omitted); *see also United States v. Torres,* 901 F.2d 205, 217–19 (2d Cir.) (presence of loaded firearm in apartment for the purpose of protecting narcotics constitutes use in relation to drug trafficking), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990).

The evidence in this case was sufficient to support the jury's conclusion that Allison used the firearms for the purpose of protecting the heroin stash. The nine-millimeter pistol recovered from the dining room table was within Allison's reach when Detective Liebrecht first spotted it, and the .44 caliber rifle, as well as being within Allison's easy grasp as he exited the bedroom, was kept in a strategic position with respect to the heroin hidden in the bedroom closet. Both guns were loaded. The jury was entitled to infer that the firearms were on hand to protect the heroin in the bedroom closet and that the presence of the weapons therefore facilitated Allison's drug trafficking offense. *See Villagrana,* 5 F.3d at 1051; *Torres,* 901 F.2d at 217–19. Allison's challenge to the sufficiency of the evidence in support of his conviction on Count 4 is therefore without merit.

### 4. The Denial of Allison's Motion in Limine

■ Allison contends that the plastic bag containing ninety-one tinfoil packets recovered from the pipe directly below the toilet at 2179 North 45th Street on August

20, 1991 should have been excluded from evidence on the ground that it was not relevant to deciding any issue in the case. Fed. R.Evid. 401, 402. Allison further argues that even if the evidence was relevant, the district court erred in admitting it because its probative value was substantially outweighed by the danger that it would be unfairly prejudicial or misleading. Fed.R.Evid. 403. We accord special deference to the trial court's evidentiary rulings and review a decision concerning the admissibility of evidence only for a clear abuse of discretion. *United States v. Hughes,* 970 F.2d 227, 232 (7th Cir.1992); *United States v. Degaglia,* 913 F.2d 372, 375 (7th Cir.1990). We discern no abuse of discretion in this case.

Rule 402 of the Federal Rules of Evidence provides that all relevant evidence is admissible; Rule 401 provides that evidence is "relevant" if it has a tendency to make the existence of any material fact more probable or less probable than it would be without that evidence. A trial judge may, however, exclude relevant evidence pursuant to Rule 403 if the judge determines that "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." The trial judge's weighing of the relative probative value of evidence compared with the risk of unfair prejudice or confusion is entitled to "great deference." *Hughes,* 970 F.2d at 233. The ninety-one tinfoil packets retrieved from the toilet at the duplex where Glen James, Twan James, Allison and Williams were arrested were introduced into evidence for the purpose of proving what the defendants had been doing at the time of their arrest. The evidence was relevant because it served to corroborate the testimony of the arresting officers that upon their arrival at the duplex, the suspects were in the process of packaging illegal narcotics for distribution and began destroying the contraband as soon as they were aware of the officers' presence.

■ Allison's contention that the admission of the tinfoil packets was unfairly prejudicial because no chemical testing was performed on the brown powdery substance contained in the packets is without merit. Where, as here, strong circumstantial evidence supported an inference that the packets contained narcotics, and a chemical analysis of the substance in the packets was impossible due to its exposure to moisture (the drug having been hidden in the toilet), scientific verification of the identity of the substance is not a prerequisite to admitting the packets into evidence. *United States v. Schrock,* 855 F.2d 327, 334–35 (6th Cir.1988); *United States v. Uwaeme,* 975 F.2d 1016, 1019–20 (4th Cir.1992); *United States v. Walters,* 904 F.2d 765, 770–71 (1st Cir.1990) (collecting cases). Nor did the lack of scientific proof cause unfair prejudice to Allison by inviting the jury to give the evidence undue weight, beyond its legitimate probative value. *See Schrock,* 855 F.2d at 335 & n. 10. Indeed, as in *Schrock,* given that the evidence was admissible under Rules 401 and 402 and that the government was precluded from asserting that it had obtained scientific proof of the identity of the brown substance in the packets, Allison was able to argue to the jury that it should reject the government's version of what took place at the duplex. *See id.* His argument that the evidence unfairly prejudiced him because it could not be chemically analyzed thus fails.

Allison's contention that someone other than one of the four men arrested on July 30, 1991 could have placed the packets into the pipe during the three-week period before the packets were retrieved is purely speculative, particularly in light of the testimony of Detective Liebrecht and Officer Hammerling, who stated that when they entered the duplex on July 30, 1991, they saw and heard evidence of the defendants' frantic efforts to destroy the illegal drugs, including the sound of a toilet being flushed. (Dec. 8, 1992 Tr. at 117; Dec. 9, 1992 Tr. at 91–92.) The fact that Detective Liebrecht did not find the packets when he searched the toilet does not detract from the probative value of the evidence because the maintenance man who recovered the packets used a hand snake, which permitted him to reach farther into the pipe leading from the toilet than Detective Liebrecht had been able to reach at the time he examined it. (Dec. 8, 1992 Tr. at 117–18; Dec. 15, 1992 Tr. at 83–84.) The tinfoil packets, their location, and the circumstances of their discovery thus provided probative

evidence of the activities of the four suspects at the time of their arrest. We therefore reject Allison's argument that the evidence lacked relevance and that its relatively low probative value was outweighed by the risk of unfair prejudice.

### 5. Allison's Challenge to his Sentence

■ Allison contends that the district court erred in determining that he was responsible for the distribution of twenty-one kilograms of cocaine and thus miscalculated his base offense level under the Sentencing Guidelines. Allison maintains that the district court's error stems from (1) its reliance upon the inconsistent testimony of Glen James regarding the amount of cocaine that Allison had transported for the conspiracy, and (2) the fact that the district court held Allison accountable for cocaine transactions by other members of the conspiracy that he could not have reasonably foreseen.

A district court's calculation of the quantity of drugs involved in an offense is a factual finding which we review under a clearly erroneous standard. *United States v. Beler*, 20 F.3d 1428, 1431 (7th Cir.1994); *United States v. Cotts*, 14 F.3d 300, 305 (7th Cir.1994). Under this standard, we vacate a sentence only when "on the entire evidence [we are] left with the definite and firm conviction that a mistake has been committed." *Duarte*, 950 F.2d at 1265 (internal quotations, citations omitted). The government bears the burden of establishing the quantity of drugs for which Allison is responsible by a preponderance of the evidence. *See Beler*, 20 F.3d at 1431.

■ In a drug distribution conspiracy, each conspirator is responsible for the amount of narcotics with which he was directly involved, and the amounts involved in transactions by coconspirators that were reasonably foreseeable to him. *United States v. Paters*, 16 F.3d 188, 191 (7th Cir.1994); *Goines*, 988 F.2d at 775. "[T]he most relevant factor in determining the reasonable foreseeability of conduct engaged in by coconspirators ... is the scope of the defendant's agreement with the other conspirators." *United States v. Edwards*, 945 F.2d 1387, 1392 (7th Cir.1991), *cert. denied*, ——

U.S. ——, 112 S.Ct. 1590, 118 L.Ed.2d 308 (1992); *see Goines*, 988 F.2d at 775; *United States v. Thompson*, 944 F.2d 1331, 1344 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1177, 117 L.Ed.2d 422 (1992). Thus, reasonable foreseeability "means more than subjective awareness" that a drug distribution network exists; instead, the individual defendant may be held responsible for the conduct of coconspirators "if that defendant has demonstrated a substantial degree of commitment to the conspiracy's objectives, either through his words or his conduct." *Edwards*, 945 F.2d at 1393–94. Furthermore, when sentencing a defendant on the basis of narcotics transactions by coconspirators, the district court should set forth the reasons why the particular defendant reasonably foresaw the amount of drugs for which he will be held responsible. *Goines*, 988 F.2d at 775 (citing *Edwards*, 945 F.2d at 1399); *see also United States v. Young*, 997 F.2d 1204, 1211 (7th Cir.1993) (discussing importance of individualized determinations of foreseeability). Where a district court has offered no more than a "generic" statement of reasons, we are required to determine whether the particular defendant "has offered meritorious arguments for remanding the case for resentencing." *United States v. Mojica*, 984 F.2d 1426, 1443–44 (7th Cir.) (quoting *Edwards*, 945 F.2d at 1400) (internal quotations omitted), *cert. denied*, —— U.S. ——, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993).

At Allison's sentencing hearing, the district court heard testimony from Glen James concerning the amount of cocaine and heroin Allison and other couriers transported for the conspiracy. When several discrepancies concerning the number of trips, dates of deliveries, and quantities of drugs delivered by Allison and others emerged in James' testimony, the district judge personally interrogated James and established that Allison had transported a total of 10 kilograms of cocaine and 6 ounces of heroin in three separate trips that he undertook for James. (Mar. 29, 1993 Tr. at 53, 77.) James also testified that on each occasion, Allison transported the narcotics in a duffle bag that James himself packed and that Allison took the Greyhound bus from Los Angeles to Milwaukee and deliv-

ered the narcotics to James in Milwaukee. (Mar. 29, 1993 Tr. at 39–45, 55–56.) James covered all of Allison's expenses and paid him between $1,000 and $1,500 per trip. (Mar. 29, 1993 Tr. at 29.) James further testified that between June 1990 and August 1992, he employed Carolyn Ward and Yvonne Ferguson as couriers on the Los Angeles-to-Milwaukee route. (Mar. 29, 1993 Tr. at 25–27.) According to James' testimony, Ward made three trips for James, transporting a total of 6 kilograms of cocaine and 4 ounces of heroin, and Ferguson made two trips, both in the spring or summer of 1992, transporting a total of 5 kilograms of cocaine for James. (Mar. 29, 1993 Tr. at 26–28.) In addition, James learned from coconspirators that Ward transported 4 kilograms of cocaine for John Bryant (also known as Hightower) in February 1992 and that Ferguson transported an unspecified quantity of heroin for Bryant. (Mar. 29, 1993 Tr. at 28–29.)

The district court then proceeded to calculate Allison's base offense level. The court found by a preponderance of the evidence that Allison should be held responsible for the narcotics that he himself transported, as well as for all of the cocaine delivered to his coconspirators by Ward and Ferguson. The court thus attributed approximately 21 kilograms of cocaine and 6 ounces of heroin to Allison, resulting in a base offense level of 34. See U.S.S.G. § 2D1.1(a)(3), (c)(5). The court also determined that Allison was less culpable than the other members of the conspiracy and accordingly granted Allison a two-level downward adjustment for being a minor participant. See U.S.S.G. § 3B1.2(b). Allison's criminal history category was set at IV, yielding a guideline range of 168 to 210 months of imprisonment. The district court then sentenced Allison to three concurrent terms of 168 months in prison, a mandatory consecutive term of 60 months in prison for using a firearm in relation to a drug trafficking crime, and five years of supervised release.

Allison first argues that the district court erred in relying on the plainly inconsistent testimony of James. The credibility determinations of a sentencing judge are entitled to great deference and will rarely be disturbed on appeal. *United States v. Kozinski,* 16 F.3d 795, 820 (7th Cir.1994); *United States v. Schuster,* 948 F.2d 313, 315 (7th Cir.1991); *United States v. Osborne,* 931 F.2d 1139, 1153 (7th Cir.1991). In response to Allison's objection that James' testimony was unworthy of credence, the district court stated:

> I think we have to view his testimony in the light of the observation that he was in the center of the maelstrom of a wide-ranging conspiracy with a lot of active transactions occurring in a number of drug houses. So I'm not, I really am not surprised that you've got discrepancies.

(Mar. 29, 1993 Tr. at 77.) The district court then determined that James' testimony was generally credible and that Allison could be held accountable for a total of 10 kilograms of cocaine and 6 ounces of heroin that he transported on three separate occasions at James' behest. However, because James testified that Allison's third trip took place on or immediately after February 10, 1992, and Allison established that he was incarcerated in Los Angeles County Jail on that date, the district court decided not to include in its calculation the 3 kilograms of cocaine that Allison was alleged to have transported on the third trip. (Mar. 29, 1993 Tr. at 78.) Thus, the district court addressed the discrepancies pointed out by Allison, explained why it decided that James' testimony was for the most part credible, and, in calculating Allison's base offense level, used the lower of two inconsistent estimates of the total amount of narcotics transported by Allison. See *Beler,* 20 F.3d at 1436; *Duarte,* 950 F.2d at 1266. Moreover, James' testimony concerning the drugs Allison brought back on his first trip, which took place on July 28, 1991, was well corroborated by the evidence retrieved from the duplex at 2179 North 45th Street two days later. (Mar. 29, 1993 Tr. at 38–39, 72.) We are therefore unable to conclude that James' testimony was so implausible or internally inconsistent that the district court erred in crediting James' account of the first two trips by Allison and in attributing the amounts of narcotics transported in those trips to Allison. See, e.g., *Osborne,* 931 F.2d at 1153.

Allison next challenges the district court's determination that the 6 kilograms of cocaine transported by Ward and the 4 kilograms of cocaine transported by Ferguson, all at James' behest, as well as the 4 kilograms of cocaine transported by Ward for Bryant in February 1992, were reasonably foreseeable by Allison.[9] Because the district court did not give reasons in support of its finding that Allison should have foreseen that other couriers were transporting drugs for the conspiracy and thus should be held responsible for the amounts they delivered, we must determine whether Allison has offered a meritorious argument for vacating his sentence. See Mojica, 984 F.2d at 1443–44; Edwards, 945 F.2d at 1399–1400.

Allison maintains that he was "a very minor player" in the conspiracy, that he had little interaction with coconspirators, and that he could not have reasonably foreseen that other couriers were delivering kilogram quantities of cocaine to the conspiracy. The record before the district court controverts Allison's version of events. When Allison was arrested on July 30, 1991, with three of the leaders of the conspiracy, he clearly knew or should have known that he had joined a major drug distribution network. Yet Allison chose to remain a member of the conspiracy and to continue working as a courier for his coconspirators for a period of at least six months after his arrest. Contrary to Allison's assertion that he had little interaction with other members of the network, the circumstances of his arrest show that Allison acted in concert with the leaders of the conspiracy in packaging narcotics for further distribution in the network. Allison's degree of involvement in the conspiracy

therefore surpassed that of a mere courier. Under these circumstances, the government contends that Allison must be held responsible for all the amounts of cocaine delivered by coconspirators Ward and Ferguson.

We first observe that Allison was properly held accountable for the amounts of cocaine delivered by couriers on the Los Angeles-to-Milwaukee route after he became a member of the conspiracy. As the government pointed out at the sentencing hearing, although Allison might not have reasonably foreseen the 6 kilograms of cocaine delivered to Glen James by Carolyn Ward during the earliest stages of the conspiracy, once he joined the conspiracy in July 1991, it was reasonably foreseeable to him that he had become part of a large-scale distribution network involving the importation of large quantities of cocaine and heroin from Los Angeles to Milwaukee.[10] (Mar. 29, 1993 Tr. at 62–63.) We therefore agree that as of July 1991, Allison had demonstrated a substantial degree of commitment to the objectives of the conspiracy and thus had embraced a conspiratorial agreement of sufficient scope to be held responsible for the narcotics delivered by his coconspirators. See Edwards, 945 F.2d at 1394–95, 1399. By this reasoning, Allison must be held accountable for a total of at least 16 kilograms of cocaine and 6 ounces of heroin as follows: Allison himself delivered 7 kilograms of cocaine and 6 ounces of heroin to James in 1991; Ferguson delivered 5 kilograms of cocaine to James in the spring or early summer of 1992; and Ward delivered 4 kilograms of cocaine to Bryant (also known as Hightower) in February 1992. Because Allison was properly held responsible for at least 15 kilograms of cocaine for purposes of

9. The district court and the government apparently believed that Ferguson transported 4 kilograms of cocaine for Bryant in February 1992. (Sentencing Tr. at 61, 78.) James testified, however, that Ward, not Ferguson, transported the 4 kilograms of cocaine for Bryant; James further testified that Bryant apprised him of the delivery and that he saw Ward with some of the cocaine from that shipment. (Sentencing Tr. at 28–29.) James also testified that Ferguson delivered a total of 5 kilograms of cocaine to James in the spring or summer of 1992. (Sentencing Tr. at 26–28.)

10. We also note that several courts have recently disapproved of using the concept of reasonable foreseeability to hold a defendant accountable for conduct occurring before that defendant joined the conspiracy. See United States v. O'Campo, 973 F.2d 1015, 1022–26 (1st Cir.1992); United States v. Carreon, 11 F.3d 1225, 1235 (5th Cir. 1994); United States v. Petty, 982 F.2d 1374, 1377 (9th Cir.1993). In the present case, it was never established whether Ward's deliveries to James occurred before or after Allison became a member of the conspiracy. As discussed below, the exclusion of these quantities from the calculation makes no difference in Allison's base offense level.

sentencing, the district court correctly calculated his base offense level.[11] *See* U.S.S.G. § 2D1.1(c)(5). Allison's challenge to his sentence is accordingly rejected.

## D. *Yvonne R. Ferguson*

Yvonne R. Ferguson was found guilty of conspiring to possess with intent to distribute in excess of five kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846, and 18 U.S.C. § 2 (Count 1). She was sentenced to 97 months in prison and five years of supervised release. Ferguson contends that her conspiracy conviction was not supported by sufficient evidence and that the search of her hotel room and the subsequent search of her apartment were conducted in violation of her Fourth Amendment rights. We will examine these contentions in turn.

### 1. Sufficiency of the Evidence—Count 1

■ Ferguson rightly concedes that in challenging the sufficiency of the evidence in support of her conspiracy conviction, she bears a heavy burden. Viewed in a light most favorable to the government, the evidence was sufficient to establish that Ferguson purchased four guns for members of the conspiracy, two of which were recovered from Granvel Windom and Thomas Hightower, and that she allowed members of the conspiracy to use her apartment to store heroin, cocaine, and paraphernalia used to cut and package narcotics for distribution. Moreover, the government produced evidence that Ferguson was acquainted with and knew how to reach Glen and Twan James, Parker, Ward, and Linnear, that she possessed four receipts for money orders that had been purchased by Glen James under an alias, that she once purchased two one-way airplane tickets from Chicago to Los Angeles for Twan James, and that upon her arrest she volunteered to give the police information concerning certain members of the Los Angeles Crips. This circumstantial evidence, when combined with the evidence that she provided coconspirators with firearms and a place to store narcotics and para-

phernalia, permitted the jury to conclude that Ferguson "knew of the illegal objective of the conspiracy and agreed to participate in its achievement." *Burrell*, 963 F.2d at 987.

Ferguson insists that the evidence merely proves that she associated with Hightower, who kept narcotics in her apartment, and that she purchased some guns for Hightower in a one-time transaction that did not imply a willingness on her part to join the conspiracy. Ferguson claims that she is a heroin addict who sporadically did favors for Hightower in order to assure her access to a steady supply of heroin, and that she never participated in any phase of drug distribution or knowingly assisted others in the trafficking of drugs. Although Ferguson's version of the facts is plausible, the jury was entitled to reject it. *See Goines*, 988 F.2d at 758; *Durrive*, 902 F.2d at 1225, 1229–30. Moreover, as this court observed in *Goines*, "[n]ot everyone in a drug trafficking conspiracy has to sell drugs." 988 F.2d at 768. Indeed, a defendant who obtains guns for coconspirators "provides a valuable service to the conspiracy." *Id.* Similarly, a defendant who allows coconspirators to use her residence as a place for storing narcotics and drug trafficking paraphernalia also renders a valuable service to her coconspirators, increasing the likelihood that they will succeed in their illegal aim. *United States v. Zafiro*, 945 F.2d 881, 888 (7th Cir.1991) ("[I]f Zafiro knew that her apartment was being used as a stash house, she was knowingly rendering material assistance to her codefendants and desired that their malefaction succeed."), *aff'd on other grounds*, ⸻ U.S. ⸻, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). We therefore conclude that the evidence was sufficient to support Ferguson's conspiracy conviction.

### 2. Legality of the Search of Ferguson's Hotel Room

Ferguson argues that the district court erred in denying her motion to suppress the evidence seized from her hotel room on August 20, 1992 by officers of the Glendale,

---

11. Our calculation thus establishes that even if the district court erred in holding Allison responsible for the 6 kilograms of cocaine Ward delivered to James in the early stages of the conspira-

cy, the error was harmless. *See United States v. Rivera*, 6 F.3d 431, 447 (7th Cir.1993), *cert. denied*, ⸻ U.S. ⸻, 114 S.Ct. 1098, 127 L.Ed.2d 411 (1994).

Wisconsin police department on the grounds that their warrantless entry of her hotel room took place without her consent, and that she was then arrested and searched without probable cause. The government disputes both of these contentions, asserting that Ferguson freely and voluntarily allowed the officers to enter her hotel room, and that once inside, the officers uncovered sufficient evidence to support a reasonable suspicion that a crime had been committed. The government further contends that the officers' handcuffing of Ferguson did not constitute an arrest and that the degree of intrusiveness of the officers' detention and search of Ferguson was justified by their heightened suspicions.

■ We review the denial of a motion to suppress evidence for clear error. *United States v. Wilson*, 2 F.3d 226, 229 (7th Cir. 1993), *cert. denied*, — U.S. —, 114 S.Ct. 1615, 128 L.Ed.2d 341 (1994); *United States v. Spears*, 965 F.2d 262, 269 (7th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 502, 121 L.Ed.2d 438 (1992). We may consider the evidence introduced at the pre-trial suppression hearing and at the trial itself, *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir.1994),[12] and we keep in mind that the district court's ruling is clearly erroneous only if, upon reviewing all the evidence, we are "left with the definite and firm conviction that a mistake has been made." *Id.* Moreover, because the resolution of a motion to suppress evidence is highly fact-specific, we " 'give particular deference to the district court that had the opportunity to hear the testimony and observe the demeanor of the witnesses.' " *United States v. Arch*, 7 F.3d 1300, 1302 (7th Cir.1993) (quoting *United States v. Edwards*, 898 F.2d 1273, 1276 (7th Cir.1990)), *cert. denied*, — U.S. —, 114 S.Ct. 1123, 127 L.Ed.2d 431 (1994).

■ We begin by examining whether the officers' warrantless entry into Ferguson's hotel room violated the Fourth Amendment. A warrantless entry of a hotel room for the purpose of investigating a crime ordinarily violates the Fourth Amendment, un-

less it falls within an exception to the warrant requirement. *Id.; United States v. Rosario*, 962 F.2d 733, 736 (7th Cir.1992). One exception to the general rule prohibiting warrantless searches allows the police to enter a hotel room if they first obtain the consent of a person who is authorized to give that consent. *Rosario*, 962 F.2d at 736 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973)). Consent to enter a dwelling is valid only if it was freely and voluntarily given. *Schneckloth*, 412 U.S. at 222, 93 S.Ct. at 2045; *United States v. Duran*, 957 F.2d 499, 502 (7th Cir.1992). "The question of whether consent was voluntary, as opposed to the product of duress or coercion, 'is a question of fact to be determined from the totality of the circumstances.' " *Duran*, 957 F.2d at 502 (quoting *Schneckloth*, 412 U.S. at 227, 93 S.Ct. at 2048). The government bears the burden of proving by a preponderance of the evidence that a person who consents to a search does so freely and voluntarily. *Id.*

Ferguson did not testify at the hearing on her motion to suppress evidence, instead relying on her affidavit in which she asserted that the officers never requested permission to enter her hotel room and that they barged in the moment that she opened the door. (Ferguson R. at 6, Aff. of Yvonne R. Ferguson.) At the close of the hearing, the district court determined that on the evening of August 20, 1992, after receiving an informant's tip, Officer Hinman stood in the corridor outside Ferguson's hotel room and heard suspicious noises coming from her room, leading him to believe that a woman inside might be in danger. He waited for his backup to arrive, then knocked on the door and identified himself. Ferguson opened the door several inches and spoke with the officers. After Officer Hinman asked her if he could come into the room, Ferguson opened the door wide and allowed the officers to enter. The district court expressly credited Officer Hinman's account of the incident and rejected Ferguson's claim that the officers simply "barged in" without first obtaining

---

12. Citing *United States v. Chapman*, 954 F.2d 1352, 1357 n. 5 (7th Cir.1992); *United States v.*

*Ferreira*, 821 F.2d 1, 3 n. 3 (1st Cir.1987).

her consent. There is, moreover, nothing in the record that would lead us to doubt the district court's assessment. We therefore conclude that the officers' initial entry into Ferguson's hotel room did not violate her Fourth Amendment rights.

■■■ Once inside, Officer Hinman noticed a .22 caliber bullet on the nightstand next to Hightower, who appeared to be intent on hiding a bundle of clothes under his pillow. A pat-down search of the clothes under the pillow revealed $6,500 in cash and a firearm. At this juncture, the officers had specific, articulable facts warranting a reasonable suspicion that Hightower and Ferguson might be involved in criminal activity and that a limited search of Ferguson's person was necessary to determine whether she was armed. *See Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968); *United States v. Adebayo*, 985 F.2d 1333, 1339 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 2947, 124 L.Ed.2d 695 (1993). While attempting to handcuff Ferguson to complete the search, the officers discovered three hypodermic needles hidden in her waistband, one of which contained heroin. Ferguson contends that by attempting to handcuff her, the officers had placed her under arrest for purposes of the Fourth Amendment and that her arrest was not supported by probable cause. The government replies that the actions of the police did not become an arrest until the hypodermic needles were discovered, at which point the police had probable cause to arrest Ferguson. We agree with the government.

■■■ The Fourth Amendment does not prohibit all searches and seizures, but only unreasonable ones. In general, the reasonableness of a search or seizure is determined by considering whether the degree of well-founded suspicion of criminal activity is sufficient to justify the degree of intrusiveness of the challenged police conduct. *Tilmon*, 19 F.3d at 1224, 1225–26; *United States v. Lechuga*, 925 F.2d 1035, 1039–40 (7th Cir.1991); *United States v. Chaidez*, 919 F.2d 1193, 1197–98 (7th Cir.1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 209, 116 L.Ed.2d 167 (1991). "Thus, 'stops too intrusive to be justified by

suspicion under *Terry*, but short of custodial arrest, are reasonable when the degree of suspicion is adequate in light of the degree and the duration of restraint.'" *Tilmon*, 19 F.3d at 1226 (quoting *Chaidez*, 919 F.2d at 1198). In each case, the crux of our inquiry is whether the nature of the restraint imposed meets the Fourth Amendment's standard of objective reasonableness. *United States v. Weaver*, 8 F.3d 1240, 1243 (7th Cir.1993).

Following the Supreme Court's guidance in *Terry*, courts have held that a key factor in determining whether the amount of force used to effect an investigatory stop was reasonable is whether "the surrounding circumstances [gave] rise to a justifiable fear for personal safety." *Tilmon*, 19 F.3d at 1226. Thus, handcuffing a suspect in order to search his person does not transform a *Terry* stop into a full custodial arrest, provided the use of handcuffs is reasonably necessary to assure the safety of officers or bystanders. *Id.* at 1228 (collecting cases); *Wilson*, 2 F.3d at 231; *Tom v. Voida*, 963 F.2d 952, 957–58 (7th Cir.1992). We believe that the officers' decision to use handcuffs to restrain Ferguson prior to continuing their search for more weapons was reasonable in light of the facts known to them at the time they acted. First, on the basis of an informant's tip and his own observations, Officer Hinman reasonably believed that there had been a series of disturbances in Ferguson's hotel room that evening, the most recent involving a loud argument between Ferguson and Hightower. He also knew that the Exel Inn is located in an area that is often frequented by narcotics abusers and traffickers. Once he discovered the gun and the cash, he reasonably suspected that other firearms may be present in the room and that either Hightower or Ferguson might be armed. He thus took the prudent measure of briefly handcuffing the suspects before searching them. In handcuffing Ferguson, Officer Hinman did not exceed the scope of a reasonable investigatory stop, and, as both parties agree, once he discovered the heroin-filled hypodermic needle he had probable cause to place Ferguson under custodial

arrest.[13] We therefore conclude that the evidence seized from Ferguson's hotel room was admissible against her at trial.

### 3. Legality of the Search of Ferguson's Apartment

 Ferguson argues that she did not freely and voluntarily consent to the search of her apartment because she had been in police custody for nearly seven hours at the time that she gave her consent. Ferguson points out that when she gave her written consent to the search, she was being held handcuffed in the back of a police squad car at 4:15 a.m. in an unlit parking lot surrounded by police officers and that Officer Perez threatened to obtain a search warrant if she refused to sign the written consent form. She asserts that her signature on the form was therefore the product of intimidation. We reject these arguments.

The record amply supports the district court's finding that while in the holding cell, Ferguson initiated a conversation with Officer Hinman, inquiring whether the police had already searched her apartment. When Officer Hinman informed her that they had not, Ferguson told him that the apartment contained a quantity of cocaine and heroin. Officer Hinman then expressly requested Ferguson's permission to search the apartment, and Ferguson assented, claiming that the narcotics did not belong to her. The fact that Ferguson was under arrest at the time she consented to the search of her apartment, although relevant to the issue of whether her consent was voluntary, is not dispositive. See United States v. Betts, 16 F.3d 748, 753 (7th Cir.1994). When determining whether consent to search was voluntarily given, courts look to the totality of the circumstances—the whole picture—to discern whether the fact of the defendant's custody vitiated his consent. Id. (citing Duran, 957 F.2d at 503, and Schneckloth, 412 U.S. at 227, 93 S.Ct. at 2047–48). In this case, Ferguson herself asked to speak with Officer Hinman concerning whether the police wanted to search her apartment. Officer Hinman

did not broach the subject of searching Ferguson's apartment until she suggested that he would find narcotics there; indeed, there is nothing in the record to suggest that he suspected that the apartment contained contraband until Ferguson volunteered that information. The record is devoid of any facts suggesting that Ferguson was subjected to physical or mental coercion aimed at obtaining her consent to the search. Rather, the fact that despite the lateness of the hour, Ferguson agreed to accompany Officer Hinman in his squad car as he organized the search and even provided keys and information about the floor plan of the apartment to assist him, strongly supports the district court's conclusion that Ferguson was not coerced.

Ferguson is correct in observing that an officer's baseless threat to obtain a search warrant, made for the sole purpose of inducing submission, may render the defendant's subsequent consent involuntary. See United States v. White, 979 F.2d 539, 542 (7th Cir. 1992); Talkington, 843 F.2d at 1049. In this case, however, Officer Perez's statement that he would request a search warrant if Ferguson did not sign the consent form was not a mere pretext because the information Ferguson herself provided concerning the contraband in her apartment was a sufficient basis for seeking a warrant. See White, 979 F.2d at 542; Duran, 957 F.2d at 502. Officer Perez's statement thus cannot be construed as a "baseless threat" that would undermine the voluntariness of Ferguson's consent. We therefore find no error in the district court's determination that the warrantless search of Ferguson's apartment was justified on the basis of her voluntary consent.

### E. Walter Williams

Williams, like James and Allison, was found guilty of conspiring to possess with intent to distribute in excess of five kilograms of cocaine (Count 1), conspiring to possess with intent to distribute heroin (Count 2), possessing heroin with intent to distribute (Count 3), and using or carrying a

---

13. Ferguson concedes that if her arrest was supported by probable cause, the officers' subsequent search of the hotel room was justified as incident to a lawful arrest. (Appellant's Br. at 17.)

firearm in relation to a drug trafficking crime (Count 4). Williams was sentenced to a total term of 600 months in prison, to be followed by five years of supervised release. On appeal, Williams contends that the district court's denial of his motion for severance deprived him of a fair trial. Williams also challenges his sentence, asserting that the district court failed to state reasons for imposing a fifty-year term of imprisonment, as required under 18 U.S.C § 3553(c)(1). We turn first to Williams' motion for severance.

### 1. Motion for Severance

 Williams argues that the district court abused its discretion in denying his motion to sever his trial from Twan James' trial. "[A] joint trial of coconspirators who are jointly indicted is presumptively appropriate." *United States v. Clark,* 989 F.2d 1490, 1499 (7th Cir.1993). In order to prevail, Williams must show that the district court's denial of his motion for severance resulted in "actual prejudice," that is, that Williams " 'could not possibly have a fair trial without a severance.' " *Id.* (quoting *United States v. Caliendo,* 910 F.2d 429, 437 (7th Cir.1990)); *see also Boykins,* 9 F.3d at 1289. Relying on *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), Williams contends that the district court deprived him of a fair trial when it admitted Agent Perala's testimony that Twan James had incriminated Williams as a member of the Crips. Williams claims that because Twan James chose not to testify and therefore could not be cross-examined, Williams was deprived of his Sixth Amendment right of confrontation on a vital issue in the government's case. We disagree.

A brief review of Agent Perala's challenged testimony is necessary to resolve the issue Williams raises. During his direct examination by the government, Agent Perala recounted his interview with Twan James following James' arrest. Agent Perala asked James if he and several other persons were members of any group or organization, and James stated that "[he] and his brother were both Crip gang members of the set known as the 118th East Coast Crips since 1987." (Dec. 14, 1992 Tr. at 141.) Their conversa-

tion then turned to other individuals. Agent Perala testified that James had stated that Walter Williams was a member of "the same Crip set, of the 118th Street East Coast Crips." (Dec. 14, 1992 Tr. at 143.) On redirect examination, Agent Perala testified that in response to questions concerning drug dealing, James had "stated that the 118th Street East Coast Crips is not a 'drug organization;' that individual members are merely involved in drug dealing for their individual profit." (Dec. 15, 1992 Tr. at 54.)

The facts of Williams' case present at best a weak analogy to *Bruton.* In *Bruton,* a postal inspector testified that Bruton's codefendant confessed that he and Bruton had committed an armed postal robbery. 391 U.S. at 124, 88 S.Ct. at 1621–22. The Supreme Court determined that the codefendant's confession "added substantial, perhaps even critical, weight to the Government's case in a form not subject to cross-examination" because the codefendant chose not to testify. *Id.* at 127–28, 88 S.Ct. at 1623. The Court then held that "where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial," a limiting instruction is not "an adequate substitute for [Bruton's] constitutional right of cross-examination." *Id.* at 135–37, 88 S.Ct. at 1627–28. Bruton was therefore entitled to a new trial. *Id.* The Supreme Court has since clarified the scope and applicability of the rule in *Bruton.* In *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), the Court held that where a nontestifying codefendant's statement does not expressly incriminate the defendant but only becomes incriminating when it is linked with other evidence in the case, admitting the statement does not violate the defendant's Sixth Amendment right of confrontation. *Id.* at 208–11, 107 S.Ct. at 1707–09.

The challenged statement in Williams' case is neither a confession nor otherwise "powerfully incriminating." *United States v. Hirschberg,* 988 F.2d 1509, 1514 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 311, 126 L.Ed.2d 258 (1993). If the statement was incriminating at all, it was so only as circum-

stantial evidence, requiring the jury to infer that anyone who is claimed to be affiliated with the Crips gang is more likely to be a coconspirator in the charged conspiracy and to possess heroin and firearms.[14] Indeed, Agent Perala testified that Twan James mentioned Williams' name in the context of being acquainted with him as a member of the Crips, but not during the phase of the interrogation when the agent asked James about narcotics trafficking by the Crips. *See United States v. Gio,* 7 F.3d 1279, 1287 (7th Cir.1993) (rejecting "contextual implication" argument, which requires looking beyond statement to other evidence presented at trial to determine if defendant was incriminated). The district court was therefore correct in ruling that the admission of James' statement did not violate Williams' rights under *Bruton* and thus did not warrant a severance on that basis.

We also agree with the government that Williams was not prejudiced by the admission of James' statements. *See Clark,* 989 F.2d at 1499. Far from being "vital" to the government's case as Williams contends, James' statement that Williams was a member of the Crips was of comparatively minor probative value in demonstrating that Williams knew of and intended to join the conspiratorial agreement to distribute narcotics and that he possessed heroin and firearms. In addition to the circumstantial evidence of Williams' guilt obtained during the investigation of the drug packaging operation at 2179 North 45th Street, Charles Shaw testified that Williams sold cocaine and heroin from a drug house located near Twelfth and Center in Milwaukee. (Dec. 10, 1992 Tr. at 73–74.) The jury also heard a tape-recording of an intercepted telephone conversation in which Parker suggested that Williams be told of Glen James' mismanagement of the conspiracy so that Williams could take care of it. *See Zafiro v. United States,* —— U.S. ——, ——, 113 S.Ct. 933, 939, 122 L.Ed.2d 317 (1993) (government offered sufficient evidence as to each defendant's guilt). Additionally, the district judge carefully instruct-

ed the jury that it must give separate consideration to each charge and to each defendant, that the defendants were not on trial for any act or conduct not alleged in the indictment, and that if the evidence only established that a particular defendant was a member of a conspiracy other than the one specifically charged in the indictment, that defendant must be acquitted. The judge further instructed the jury that a business or social association with others who are guilty of a crime does not support the inference that the defendant himself is guilty of the crime, and that a conspiracy conviction cannot rest solely on evidence of association with members of the conspiracy. (Williams R. at 27.) These exemplary instructions were sufficient to mitigate any risk of prejudice to Williams. *Zafiro,* —— U.S. at ——, 113 S.Ct. at 938–39; *Clark,* 989 F.2d at 1501. Williams has therefore failed to show that he was actually prejudiced by being required to stand trial with Twan James, and the district court did not abuse its discretion in denying his severance motion.

### 2. Williams' Challenge to his Sentence

■ Williams also argues that because the district court did not state its reasons in open court for imposing a fifty-year term of imprisonment on Williams, the sentence is unlawful and must be vacated. 18 U.S.C. §§ 3553(c)(1), 3742(a)(1). Williams' argument is without merit.

Section 3553(c)(1) provides that when a sentence is imposed pursuant to the Sentencing Guidelines and the range of imprisonment exceeds 24 months, "[t]he court, at the time of sentencing, shall state in open court ... the reason for imposing a sentence at a particular point within the range." 18 U.S.C. § 3553(c)(1); *see United States v. Chartier,* 933 F.2d 111, 117 (2d Cir.1991). Williams is correct that in sentencing him, the district judge did not address specific evidence in the case and explain why that evidence justified imposing a fifty-year sentence. This does not, however, entitle Williams to a remand.

---

14. *Cf. Arizona v. Fulminante,* 499 U.S. 279, 296, 111 S.Ct. 1246, 1257, 113 L.Ed.2d 302 (1991) (distinguishing a confession, which "is like no other evidence," from statements by a defendant that "may concern isolated aspects of the crime or may be incriminating only when linked to other evidence").

*See United States v. Underwood,* 938 F.2d 1086, 1088–89 (10th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 3043, 125 L.Ed.2d 729 (1993); *United States v. Dumorney,* 949 F.2d 997, 998 (8th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 2457, 124 L.Ed.2d 672 (1993). Although the judge did not make specific references to the record in support of Williams' sentence, he did state reasons for his choice of sentence within the applicable Sentencing Guideline range. The remarks the district judge made were sufficient to demonstrate that in selecting a fifty-year term of incarceration, the judge was mindful of the viciousness of Williams' crimes, his lack of rehabilitative potential, and the need to protect the public from further crimes by Williams. The judge thus gave consideration to appropriate factors in selecting Williams' sentence, *see* 18 U.S.C. § 3553(a), and fulfilled his obligation under 18 U.S.C. § 3553(c)(1) to state reasons for imposing a fifty-year sentence. We therefore reject Williams' challenge to his sentence.

### III. CONCLUSION

For the reasons set forth above, we AFFIRM the convictions of Twan J. James, Ernest Parker, and Yvonne R. Ferguson, and the convictions and sentences of Reginald G. Allison and Walter Williams.