UNITED STATES of America,
Plaintiff–Appellee,

v.

Agustin FLORES–SANDOVAL,
Defendant–Appellant.

No. 95–2107.

United States Court of Appeals,
Seventh Circuit.

Argued March 29, 1996.

Decided Aug. 28, 1996.

348

Barry Rand Elden, Chief of Appeals, Brian Havey (argued), Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

Kathryn Hall, Hall & Kurz, Chicago, IL, Sylvia Baiz (argued), San Diego, CA, for Defendant–Appellant.

Before CUMMINGS, MANION, and EVANS, Circuit Judges.

MANION, Circuit Judge.

Pursuant to a plea agreement, Agustin Flores–Sandoval ("Flores") pleaded guilty to one count of attempting to possess with the intent to distribute approximately 72 kilograms of cocaine. He was sentenced to a 200–month term of imprisonment and fined $8,000. Flores appeals his sentence, and argues he should be granted a new sentencing hearing because the government violated the disclosure requirements of *Brady v. Maryland.* We affirm the district court.

## I.

Early in 1994, Flores induced Marie Saldana and Kelly Longie to transport marijuana from Los Angeles to Chicago. Flores helped them obtain false Illinois driver's licenses and he and an associate, Modesto Delgado, assisted Saldana in purchasing and licensing a Chevrolet Suburban for the trip. When Flores and the two women flew to Texas to pick up the Suburban, they were met and assisted by two unidentified individuals. Flores, Saldana, and Longie then drove the Suburban to Los Angeles where, after Flores placed a phone call, yet another individual picked up the Suburban and later returned it to the motel where they were staying. Flores instructed the two women on the route they should take and the time of day they should drive from Los Angeles to Chicago. He provided them with his pager number and instructed them to phone the number each night and report the area code of their location. He then departed, leaving them to drive to Chicago. Saldana and Longie arrived in Chicago several days later and paged Flores. Delgado came to the motel where the two women were staying and picked up the Suburban. Flores paid them $3,500 each for their effort.

Several days later, the operation was repeated. The three drove to a motel in Los Angeles. Flores took the Suburban and returned it later. The two women then left for Chicago. En route, the Suburban broke down. Saldana contacted Flores who wired money for the repairs. The two women then completed their trip to Chicago where they were paid $5,000 each. Flores provided Longie with a truck to be used in a third shipment and Longie recruited a friend, Jeanette Rogerson, to accompany her. Longie and Rogerson drove the truck to Los Angeles and then back to Chicago. Flores arranged a fourth trip in which Longie and her mother carried drugs from Los Angeles in the truck at the same time Saldana, her son Jeffrey Sanchez, and Rogerson carried drugs in the Suburban. Once in Chicago, after the truck and van had been retrieved from the women, Flores and a man named Baltazar Haro paid Longie and Saldana $10,000 each for the trip.

Saldana agreed to make another (what turned out to be the final) trip in the Suburban. She, Sanchez, and Rogerson drove to Los Angeles and, as usual, checked into a motel. Saldana paged Flores, Delgado returned the page, and soon after an individual picked up the Suburban and returned it to the motel the next day. The party then left for Chicago.

Passing through Kansas they were stopped by state police who obtained their consent to search the Suburban. Concealed behind a false floor panel the police found 72 kilograms of cocaine. Saldana was arrested. She soon agreed to cooperate and told the police what she knew about the operation. To account for the time she was detained, the police had Saldana page Flores and advise him she had broken down. He wired her money for repairs. Saldana then drove the Suburban to Chicago and paged Flores. An hour later Flores and Delgado arrived at Saldana's hotel to retrieve the Suburban. Agents for the Drug Enforcement Administration followed the two and later arrested them.

Flores was charged with attempting to possess with intent to distribute approximately 72 kilograms of cocaine. In a plea he admitted he attempted to possess the 72 kilograms of cocaine contained in the final shipment and admitted the facts surrounding the final shipment as described above. Flores also admitted as relevant conduct that the other shipments had taken place at his direction as described above. Pursuant to the Sentencing Guidelines, the district court sentenced Flores to a 200–month term of imprisonment and fined him $8,000.

On appeal Flores alleges that the court incorrectly increased his sentence by erroneously finding that he was a manager or supervisor of an operation involving five or more participants, and failed to articulate its reasons for selecting his sentence and for imposing a fine. He also alleges the government breached its plea agreement and failed to turn over exculpatory evidence.

## II.

### A. Three–Level Increase Under § 3B1.1(b)

Under the Sentencing Guidelines the sentencing court must increase a defendant's offense level by three levels if his role was that of "manager or supervisor" and "the criminal activity involved five or more participants or was otherwise extensive." USSG § 3B1.1(b). The district court found both and increased Flores' sentencing level accordingly. Flores challenges the finding, arguing that the court erroneously considered conduct beyond what was relevant to Flores' role in the "offense of conviction" (attempted possession with intent to distribute 72 kilograms of cocaine).

In his plea agreement, Flores "acknowledge[d] that for the purpose of computing his sentence under the U.S. Sentencing Guidelines, the following conduct, to which he stipulates, constitutes relevant conduct under Section 1B1.3 of the guidelines." The agreement then related the conduct described above. But even though Flores stipulated to the conduct, and acknowledged its relevance to determining the base offense level, he now argues that the court should not have considered that conduct in determining his role in the offense. Yet by stipulating to the conduct in the plea agreement, Flores has waived any claim that he did not engage in that conduct. To the extent Flores challenges the court's conclusion that he was a manager or supervisor of five or more persons based on the stipulated conduct, we review for clear error. *United States v. Soto*, 48 F.3d 1415, 1420 (7th Cir.1995) (district court determination of defendant's role in the offense is finding of fact reviewed for clear error). Under clear error review, "we will not reverse the district court unless after reviewing the entire record we are 'left with a definite and firm conviction that a mistake has been committed.'" *United States v. Price*, 54 F.3d 342, 346 (7th Cir.1995) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)). Further, we may affirm Flores' sentence on any grounds found in the record, regardless of the rationale employed by the district court. *United States v. Mustread*, 42 F.3d 1097, 1104 (7th Cir.1994).

The relevant conduct Flores admitted in the plea agreement indicates he exercised

direct influence over at least two other participants. For example, he admitted that "between approximately March 22, 1994, and July 16, 1994, *at the direction of defendant Agustin Flores–Sandoval* [i.e. Flores], Saldana and Longie completed a total of approximately four trips between Los Angeles and Chicago for the purpose of picking up and delivering controlled substances to the defendant." (Emphasis added.) This is enough to establish that Flores exercised a managerial or supervisory role in the criminal activity. *See, e.g., United States v. Brown,* 944 F.2d 1377, 1381 (7th Cir.1991) (defendant's control over others is an important and recurring factor in § 3B1.1 determination). Flores exercised "influence rising to the level of an 'organizer, manager, or supervisor.'" *United States v. Mustread,* 42 F.3d 1097, 1105 (7th Cir.1994). He directed the various couriers where and when to go; he arranged for them to receive the cars they would drive; he instructed them how to contact the person or persons who loaded the drugs into the secret compartments; and he instructed them how to drive to Chicago. He also assisted them in obtaining false driver's licenses. Flores' overall tight control of the courier operation indicates he was in charge of at least this portion of the distribution operation. The admitted conduct supports the conclusion that Flores was "principally responsible for arranging the logistics of cocaine deliveries or payments, ... requir[ing] him to dictate to some extent, or at least coordinate, the actions of [Saldana and Longie]." *United States v. Vargas,* 16 F.3d 155, 160 (7th Cir.1994). Even if Flores had someone to whom he answered within the organization, as he argues, that does not diminish his role in directing the drug courier traffic he admitted pursuant to his plea agreement. Section 3B1.1(b) requires only that he be a manager or supervisor, not the leader. *United States v. Carrillo,* 888 F.2d 117, 118 (11th Cir.1989) ("That there were bigger fish in the larger scheme does not ... absolve [Flores] of the supervisory role he played....").

The conduct which Flores admitted in the plea agreement also supports the court's finding that more than five knowing participants were involved in the operation. The plea agreement identifies more than five knowing participants either by name if known, or at least by their role in the drug transport operation. In addition to Flores himself, the plea agreement admits participation by Delgado, Saldana, Longie, Rogerson, at least one associate who picked up the car in Los Angeles, and whoever picked up the car in Chicago. The facts suggest even more people. At the beginning of each trip, the car was picked up by someone other than the courier and taken to another location where panels were removed and drugs hidden within the vehicle. The car was then returned to the driver. When the car reached Chicago the process was reversed. The amount of drugs seized from the final shipment along with the amount of money paid to the couriers for the earlier shipments betray the transportation of a significant quantity of drugs. The admitted relevant conduct indicated what the district court termed a "sophisticated and extensive network of communications" between a number of people operating at various locations. The court's conclusion that more than five people were involved thus is supported by the relevant conduct Flores admitted in the plea agreement.

Flores argues the court should consider only the participants involved in the final shipment. But the guidelines instruct otherwise. "The determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of § 1B1.3 (Relevant Conduct) ... and not solely on the basis of elements and acts cited in the count of conviction." USSG Ch. 3 Pt. B § 3B, intro. comment. That relevant conduct, admitted by Flores in the plea agreement, supports the court's conclusion that Flores played a "managerial or supervisory" role in a criminal activity "involv[ing] five or more participants." This was by no means clear error.

## B. The Imposition Of Sentence

Based on Flores' base offense level, and the three-level increase for his role in the offense, the district court calculated Flores' sentencing range at 118–235 months and sentenced him to 200 months in prison. Flores

claims the court failed to articulate its reasons for imposing the 200–month sentence and thus that he is entitled to a new hearing.

■ Flores is correct that a sentencing court must "state, in open court the reasons for its imposition of the párticular sentence, and, if the sentence ... exceeds 24 months, the reason for imposing a sentence at a particular point within the [Guideline] range." 18 U.S.C. 3553(c)(1). But, contrary to Flores' assertion, the court did articulate its reasons for the sentence. It stated that Flores attempted to distribute 72 kilos of cocaine tested at a purity level of 97 percent. The court noted that Flores admitted as relevant conduct four automobile trips from Los Angeles to Chicago, all of which were suspected of involving large shipments of marijuana or cocaine. The court observed that from the evidence before it, it could easily presume that there was a great deal more cocaine distributed as a result of the operation than was set out in the agreement. Finally, the court recognized Flores' important role in the whole operation. The court then sentenced Flores to 200 months, which was within the applicable and agreed-upon range. While "the judge did not make specific references to the record in support of [Flores'] sentence, he did state reasons for his choice of sentence within the applicable Sentencing Guideline range." *United States v. James*, 40 F.3d 850, 879 (7th Cir.1994).[1] That was sufficient. *Id.*

## C. The Fine

■ In addition to sentencing Flores to 200 months in prison, the district court imposed an $8,000 fine on Flores. The Guidelines require the imposition of a fine unless the defendant establishes he is unable and is not likely to become able to pay. USSG § 5E1.2(a). Flores never objected or argued that he was unable to pay the $8,000 fine until this appeal, forfeiting the issue. We therefore review only for plain error. *Unit-*

*ed States v. Olano*, 507 U.S. 725, 730–36, 113 S.Ct. 1770, 1776–79, 123 L.Ed.2d 508 (1993); *United States v. Ross*, 77 F.3d 1525, 1541–42 (7th Cir.1996). Under the limited plain error exception to forfeiture, we may not reverse unless "(1) there was error; (2) the error was plain; and (3) the error affected the defendant's substantial rights." *Ross*, 77 F.3d at 1538 (quoting *Olano* at 732–35, 113 S.Ct. at 1776–78). Thus, the error must not only be "palpably wrong" but likely have resulted in a different sentence. *United States v. D'Iguillont*, 979 F.2d 612, 614 (7th Cir.1992), *cert. denied*, 507 U.S. 1040, 113 S.Ct. 1873, 123 L.Ed.2d 492 (1993); *United States v. Hope*, 906 F.2d 254, 259 (7th Cir.1990), *cert. denied*, 499 U.S. 983, 111 S.Ct. 1640, 113 L.Ed.2d 735 (1991). The district court found that "considering the defendant's financial condition" (which the court knew from the presentence report), the defendant could afford to pay an $8,000 fine in monthly installments. $8,000 over 200 months amounts to $40.00 per month. Even if the court could or should have more fully articulated its reasons for imposing a fine, an issue we do not address, its failure to do so after considering the relevant factors does not amount to plain error. Doing so would not have affected the outcome of Flores' sentence; it is clear from the record that the district court did consider the factors in the presentence report relevant to Flores' ability to pay. *See United States v. Fulford*, 980 F.2d 1110, 1117 n. 4 (7th Cir.1992). Articulating the factors the court considered in imposing the fine would not have affected the amount of the fine.

## III.

### A. The Government's Alleged Breach Of The Plea Agreement

■ Flores next argues that the government breached its plea agreement by not arguing for the low end of the applicable Guideline range and by advising the court to

---

1. *United States v. James* affirmed the convictions and sentences of five defendants, including one Walter Williams, whose sentence we affirmed, in part with the language and principle cited above. The Supreme Court subsequently vacated a portion of James' conviction, *James v. United States*, —— U.S. ——, 116 S.Ct. 664, 133 L.Ed.2d 515

(1995), and his case has been remanded in part to the district court. *United States v. James*, 79 F.3d 553 (1996). However, the Supreme Court denied Williams' petition for certiorari, *Williams v. United States*, —— U.S. ——, 115 S.Ct. 948, 130 L.Ed.2d 891 (1995), and thus our decision in *James* addressing Williams' sentence stands.

consider all relevant conduct. Flores did not raise these issues at his sentencing. "Breach of a plea agreement cannot be raised for the first time on direct appeal." *D'Iguillont,* 979 F.2d at 614 (citing *United States v. Pryor,* 957 F.2d 478, 482 (7th Cir.1992)). Forfeiture of an allegation of breach of a plea agreement is subject to the plain error exception. *Id.* This court will intervene only if the breach caused a different outcome at the sentencing hearing. *Id.* The government agreed in the plea agreement, that "[a]t the time of sentencing, the government shall recommend that the court impose a sentence at the lower end of the applicable guideline range...." The district court had this agreement. At the sentencing hearing, the court advised Flores that it need not follow the government's recommendation, a point about which the sentencing agreement itself had warned Flores. Flores indicated he understood. In this light, the government's failure to state its position on the record at the sentencing hearing did not violate the agreement. The government had already conveyed to the court its position pursuant to the agreement and the court had in its possession written evidence of that agreement. Orally stating what was contained in the written agreement, with which the court was familiar already, would have been unlikely to change the court's sentence. Therefore, even were the government required by the agreement to recite orally its recommendation, its failure to do so did not prejudice Flores and does not constitute grounds for resentencing. *Cf. United States v. Pryor,* 957 F.2d 478, 482 (7th Cir.1992) (no plain error where government's breach of plea agreement is technical failure to inform court of information about which court is already aware).

▮ Flores also argues the government breached its agreement when it advised the court to consider all relevant conduct in increasing Flores' base offense by three levels. At paragraph 7(b) of the plea agreement the government had stated that "[b]ased on the facts known to the government, there is no increase in offense levels pursuant to Guideline § 1B1.3." But the government also stated in the following paragraph, 7(c), "[i]t is the government's position that the defendant's offense level should be increased by three levels pursuant to Guideline § 3B1.1(b), based on his aggravating role in the offense." When the government advised the court to consider all relevant conduct in increasing Flores'·base offense level by three levels, it did so pursuant to paragraph 7(c). Flores argues that 7(b) precluded the government advancing this position no matter what was contained in 7(c). However, paragraph 7(b) is more reasonably read as limiting 7(a), in which the government limited the quantity of drugs on which the base offense level would be calculated, than as nullifying entirely paragraph 7(c). Further, the government was merely stating what the law requires the court to do. "Sentencing judges may use all information they possess. 'No limitation shall be placed on the information concerning the background, character, and conduct of a person ... for the purpose of imposing an appropriate sentence.'" *United States v. Fonner,* 920 F.2d 1330, 1333 (7th Cir.1990) (quoting 18 U.S.C. § 3661). Even if paragraph 7(b) should be read as Flores argues, it is unlikely the district court would have entered a different sentence because it was merely complying with the Guidelines' mandate to consider all relevant conduct, conduct which Flores had agreed was relevant in the plea agreement. The plea was not conditional and the agreement acknowledged that the sentencing recommendation was not binding on the court in any event.

## IV.

Finally, Flores argues the government breached its duty under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to provide him with exculpatory evidence in its possession. The alleged exculpatory evidence stemmed from Saldana's guilty plea. At Saldana's sentencing hearing, her attorney argued that Saldana had paid her own travel expenses out of the money Flores provided to her and thus had not been paid as much as it appeared from the evidentiary record. Flores argues this information was not provided to him and that it is material and exculpatory because it indicates Saldana was an independent contractor rather than under his supervision.

For a defendant to succeed on a *Brady* claim, he must show, "(1) that the prosecutor suppressed evidence; (2) that such evidence was favorable to the defense; and (3) that the suppressed evidence was material." *United States v. White*, 970 F.2d 328, 337 (7th Cir.1992) (quoting *United States v. Hartmann*, 958 F.2d 774, 790 (7th Cir.1992)). Flores' argument fails in several respects. First, Saldana's independent contractor status is irrelevant to whether Flores supervised or managed her role in the enterprise. One can supervise a network of "independent contractors" in a criminal enterprise as well as one can supervise "employees." Nor does the suggestion that Saldana had to pay her travel expenses out of the $5,000 she was paid for one trip indicate that she was an independent contractor. Additionally, each time she told Flores her car had broken down she was sent additional money to have it repaired, undercutting this whole line of argument. Even if the evidence had been withheld, it was neither material nor exculpatory. Moreover, no facts support the allegation that the government withheld evidence. The plea agreement and sentencing transcript indicate the government never alleged that Flores had paid Saldana's travel expenses. Instead, all the evidence indicates Flores paid Saldana a lump sum at the end of each trip. The government insists it provided to Flores all relevant evidence concerning money paid to Saldana by Flores, just as it provided the same to Saldana. Flores submits no evidence to the contrary. That Saldana chose to argue the import of that information differently than did Flores does not create a *Brady* violation. The government is not required to provide to a defendant all exculpatory arguments he might employ in defending himself.

Accordingly, Flores' sentence is AFFIRMED.