# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 12-41453

United States Court of Appeals
Fifth Circuit

**FILED**

March 17, 2014

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff – Appellee

v.

JOSE LUIS TOVAR,

Defendant – Appellant

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 7:12-CR-964-1

Before KING, CLEMENT, and GRAVES, Circuit Judges.

PER CURIAM:*

Defendant Jose Luis Tovar appeals his sentence following his guilty plea to two counts of being a felon in possession of a firearm. He challenges the district court's assessment of an enhancement under the Sentencing Guidelines for being a supervisor or manager of criminal activity involving at least five participants or that is otherwise extensive. For the reasons that follow, we AFFIRM.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-41453

## I.     FACTUAL AND PROCEDURAL BACKGROUND

In February 2009, local law enforcement agents arrested Fernando Moreno-Trevino for unlawfully carrying a weapon. He reported that he had obtained the handgun from Jose Luis Tovar in December 2008. In March 2011, federal agents obtained information from two independent sources that Tovar was posing as a drug transporter who was stealing drug loads from drug traffickers. Agents learned that once he obtained the drugs from the traffickers, he would stage a stop of the vehicle with the assistance of corrupt local law enforcement officials. A source later informed agents that he had overheard a telephone conversation between Tovar and Duval County Deputy Ruben Silva, during which Tovar told the deputy that he would pay $25,000 for assistance in stealing ten kilograms of cocaine and 1,000 pounds of marijuana. The following year, agents stopped two vehicles containing drugs that they believed to be associated with Tovar.

Sources informed federal agents that Tovar was searching for drug traffickers who needed assistance in the transportation of drugs. On April 25, 2012, a source introduced Tovar to undercover agents, who posed as drug traffickers. In a recorded telephone conversation, Tovar negotiated with the agents to transport a load of drugs to Tampa, Florida, advising them of his fee and the route that would be taken. The same source also advised the agents that Tovar had an apartment in Mission, Texas, where he kept copies of false police reports provided by the Duval County Sheriff's Department.

On April 30, 2012, the undercover agents traveled to a restaurant in McAllen, Texas, and met with Tovar and the source to discuss transporting 2,500 pounds of marijuana. Tovar explained that he would follow the truck to verify that the load vehicle made it through the United States checkpoint and would meet them in Florida to unload the truck. During that meeting, Tovar

also advised the agent that his younger brother, Jerry Tovar, had five weapons to sell.

The agents met with a source, who had a recorded telephone conversation with both Tovar brothers about purchasing the weapons. Jose Tovar had provided the source with photos of the weapons and then negotiated a purchase price. Agents then met with Jerry Tovar and Ricardo Galindo at a convenience store to complete negotiations. The agents showed cash and advised that they were ready to consummate the transaction. Galindo agreed to drive one of the undercover agent's vehicles to the location of the weapons, while Jerry Tovar left in a Cadillac Escalade. Surveillance of the vehicles revealed that they were driving toward Jose Tovar's apartment. A few minutes later, Jerry Tovar called the agents and told them to meet him at a golf course near Jose Tovar's apartment.

The agents approached the location and observed their parked vehicle, with weapons inside. They also observed the Escalade and identified both Galindo and Jose Tovar. The agents asked Jose Tovar if all six weapons were in the vehicle, and he responded that he had to retrieve the sixth weapon from his residence. While his brother was gone, Jerry Tovar collected the $8,500 payment for the weapons. Moments later, Jose Tovar returned with the sixth weapon, and the transaction was completed. Jose Tovar told the agents that he would provide the sixth weapon at no charge along with a free rifle magazine. Agents later learned that both Tovar brothers had previously been convicted of violent felonies. The agents were able to trace four of the weapons to Jerry Tovar and one of the weapons to Jose Tovar. They were unable to trace ownership for the remaining weapon.

A few days later, state law enforcement officers in Hidalgo County, Texas arrested Francisco Alvarado for possession of marijuana. He told police that

he had stored 102.6 kilograms in his apartment for an individual that he had met at a pool hall.  He had received instructions from an unidentified person to pick up a Ford vehicle loaded with marijuana and to transport the marijuana back to his apartment.  Alvarado had been instructed to deliver the marijuana to a ranch in Edinburg, Texas, where he met Jose Tovar, whom he called "The Boss."  Tovar paid him $200 and asked him to leave.  He identified Jose Tovar in a photographic lineup.

On May 21, 2012, federal agents established surveillance of the expected staged traffic stops.  They observed Deputy Silva and another deputy in the Duval County Sheriff's Office pull over two vehicles and pretend to remove ten kilograms of cocaine.  The deputies also removed $5,000 from one of the vehicles, which Deputy Silva had previously requested as a fee.

On May 23, agents obtained arrest warrants for both of the Tovar brothers on charges that they were felons in possession of firearms.  The following day, federal agents arrested Jerry Tovar after making a controlled delivery to him of six kilograms of cocaine.  After agents found and seized nine firearms from Jerry Tovar's residence, he admitted that he had previously sold six weapons to an unknown male for $8,600, but asserted that he had received only $600 from the sale.  He also confirmed that Deputy Silva had assisted him and Jose Tovar in stealing narcotics loads for about ten months and that Deputy Silva had a crew who staged the traffic stops.  He corroborated reports that instead of transporting the drugs, Jose Tovar stored them in undisclosed areas throughout the Rio Grande Valley.  Jerry Tovar related that his brother paid Silva between $6,000 and $10,000 per stop which he would divide up among his crew.  On two occasions, Jose Tovar directed him to pick up false police reports that had been faxed by Deputy Silva.

4

No. 12-41453

On the same day, federal officers executed an arrest warrant for Jose Tovar. A search of Jose Tovar's two residences revealed two weapons, a large number of rounds of different types of ammunition, a firearms cleaning kit, a magazine speed loader, and $2,000 in a safe. Jose Tovar told police in his post-arrest statement that he was operating a legitimate trucking business and that he was working undercover with Deputy Silva. He stated that the weapons found at his residences belonged to a third party and that he gave the other weapons to someone because he owed him $5,000.

Victor Carrillo, one of the local deputies suspected of assisting Deputy Silva, was also arrested. He admitted in his post-arrest statements that he had participated with Silva and other deputies in conducting staged traffic stops to facilitate the theft of large quantities of drugs. He advised that Silva paid him between $1,000 and $1,500 each time he assisted in a staged traffic stop. He reported that Jose Tovar provided Silva with the money. Police also stopped a vehicle driven by Galindo, who told agents that he had been employed by Jose Tovar as a driver and to maintain the vehicles. He denied, however, participating in a drug trafficking operation.

On June 19, 2012, an indictment was filed against Jose Tovar for two counts of unlawful possession of firearms under 18 U.S.C. §§ 922(g) and 924(a)(2); Jerry Tovar for one count of unlawful possession of firearms under 18 U.S.C. §§ 922(g) and 924(a)(2); Jerry Tovar, Silva, and Carrillo for conspiring to possess with intent to distribute a controlled substance under 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), and 846; and Jerry Tovar for one count of unlawful possession of a controlled substance under 21 U.S.C. § 841(a)(1) and (b)(1)(A).

Jose Tovar pleaded guilty, without a plea agreement, to two counts of unlawful possession of firearms. The PSR recommended that Tovar receive a

base offense level of 22 and 12 additional levels based on specific offense characteristics, resulting in a total offense level of 37. Tovar also received one criminal history point, placing him in criminal history category I. The Sentencing Guidelines range for each offense was 210–262 months; however, the statutory maximum sentence for each count was 120 months.

Jose Tovar filed several objections to the PSR. The only objection at issue in this appeal is his challenge to a three-level upward adjustment pursuant to § 3B1.1(b) based on his role as a manager or supervisor of criminal activity that involved five or more participants or was otherwise extensive. Jose Tovar denied the assertion that he was involved in the narcotics transaction for which his codefendants were charged, and asserted that his condominiums were purchased with money from real estate that he had previously sold. He pointed out that, unlike his codefendants, he had not been charged with any drug offenses. Jose Tovar also asserted that his brother was the one who had sold the weapons. He noted that ownership of only one of the weapons had been traced to him and that discovery showed the weapons had been buried at Jerry Tovar's home.

The probation officer responded, acknowledging that although the evidence showed that Jose Tovar was the owner of a trucking company, two condominiums, and a ranch that he used to facilitate the transportation and distribution of narcotics, he was not charged with any drug crimes. The probation officer stated that Jose Tovar's criminal activities were otherwise extensive, however, because he was involved in selling weapons. The probation officer further stated that Jose Tovar had directed Jerry Tovar and Galindo during a firearms sale.

During the sentencing hearing, Jose Tovar's counsel reiterated his argument that Jerry Tovar was the actual owner of most of the weapons and

was responsible for their sale.  Jose Tovar's counsel further argued that the fact that Tovar's codefendants were charged with drug offenses, while he was not charged, showed his lack of involvement in that criminal activity.  He contended that this supported finding that Jose Tovar did not have a managerial role in the offense.  During his allocution, Jose Tovar denied selling any guns and emphasized that there had been no charges filed against him involving drugs.  The Government responded that Jose Tovar was the head of the entire organization and that, although he was not involved in the conspiracy to distribute cocaine alleged in the indictment, he was involved in the theft of drugs from drug traffickers on multiple occasions in addition to the sale of weapons.

The district court overruled the objection.  It determined that Jose Tovar used his trucking company and condominiums as part of the overall organization that sold firearms, and adopted the PSR.  The district court imposed a sentence of 120 months on each count to be served consecutively in part and concurrently in part such that the total term of incarceration would be 210 months.  Jose Tovar timely appeals the assessment of a managerial role enhancement.

## II.    STANDARD OF REVIEW

In reviewing a sentence, we must ensure that the sentencing court "committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range . . . , [or] selecting a sentence based on clearly erroneous facts." *Gall v. United States*, 552 U.S. 38, 51 (2007). We review for clear error the district court's factual findings underlying its decision to apply a Guidelines enhancement and review de novo the application and interpretation of the Guidelines.  *United States v. Cisneros–Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008).  We will affirm the district court's application of

No. 12-41453

the managerial role enhancement if it is plausible in light of the record read as a whole. *See United States v. Nava*, 624 F.3d 226, 229 (5th Cir. 2010). We will reverse "only if, based on the entire evidence, [we are] left with the definite and firm conviction that a mistake has been committed." *United States v. Rose*, 449 F.3d 627, 633 (5th Cir. 2006) (quotation marks and citation omitted).

### III.    DISCUSSION

Jose Tovar appeals the district court's three-level enhancement to his sentence for his alleged role as a manager or supervisor, pursuant to the United States Sentencing Guidelines Manual ("U.S.S.G.") § 3B1.1(b). An increase to a defender's offense level is warranted "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive[.]" U.S.S.G. § 3B1.1(b) (2012). The managerial role enhancement consists of two elements. The first element is that a "defendant must have been the . . . manager . . . or supervisor of one or more other participants." *Id.* § 3B1.1 cmt. n.2. The second is that the relevant criminal activity must have involved five or more participants or have been "otherwise extensive." *Id.* § 3B1.1(b).

Jose Tovar's only challenges on appeal are to the district court's finding that the facts in the PSR were sufficient to satisfy the first element—that he was a manager or supervisor of at least one other participant in the relevant criminal activity.[1] The "defendant bears the burden of demonstrating that the PSR is inaccurate; in the absence of rebuttal evidence, the sentencing court may properly rely on the PSR and adopt it." *United States v. Ollison*, 555 F.3d 152, 164 (5th Cir. 2009) (quotation marks and citation omitted). "Rebuttal

---

[1] Because Jose Tovar did not challenge in either the district court or on appeal whether the relevant criminal activity involved at least five participants or was "otherwise extensive," that issue is not before us. *See United States v. Whitfield*, 590 F.3d 325, 346 (5th Cir. 2009) ("As a general rule, a party waives any argument that it fails to brief on appeal.").

evidence must consist of more than a defendant's objection; it requires a demonstration that the information is materially untrue, inaccurate or unreliable." *United States v. Zuniga*, 720 F.3d 587, 591 (5th Cir. 2013) (quotation marks and citation omitted).

The Guidelines' commentary provides that a court should consider the following factors in distinguishing a leadership and organizational role (to which a four-level enhancement applies) from a managerial or supervisory role (to which a three-level enhancement applies):

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 cmt. n.4. Our circuit (and others) have also frequently used these factors to determine whether a participant in a criminal activity exercised a managerial or supervisory role or a lesser role. *See, e.g.*, *United States v. Reagan*, 725 F.3d 471, 494 (5th Cir. 2013); *United States v. Otuya*, 720 F.3d 183, 192 (4th Cir. 2013); *United States v. Hoffman*, 707 F.3d 929, 935 (8th Cir. 2013); *United States v. Miranda*, 248 F.3d 434, 447 (5th Cir. 2001). A court may find that a defendant exercised a managerial role by inference from the available facts. *United States v. Valdez*, 453 F.3d 252, 263 (5th Cir. 2006).

Viewing the evidence in light of the applicable Guidelines factors, we are not left with a definite and firm conviction that the district court clearly erred in concluding that the preponderance of the evidence showed Jose Tovar managed Jerry Tovar, Galindo, or both during the relevant criminal activity. The PSR contains the following uncontested facts. While meeting with undercover federal agents, Jose Tovar proposed the sale of five firearms. He later also negotiated the purchase price and provided a source with pictures of

the weapons. The source subsequently viewed the weapons at Jose Tovar's apartment. On the date of the sale, Jerry Tovar and Galindo met with federal agents to view the purchase cash and then were observed driving in the direction of Jose Tovar's apartment. During the sale, Jose Tovar agreed to provide the buyers with a sixth weapon and ammunition free of charge. Later, when questioned at his home after additional weapons were found there, Jerry Tovar informed agents that he received only a small cut of the sale price of the six firearms. Galindo also told federal agents that he was one of Jose Tovar's employees. Galindo stated that in that capacity, he was in charge of vehicle maintenance for Jose Tovar's trucking company and performed other miscellaneous errands for him. Given these facts, several of the Guidelines factors weigh in favor of an enhancement, including Jose Tovar's recruitment of Galindo, his receipt of a larger share of the proceeds from the gun sale, his exercise of decision-making authority (such as by proposing the sale and deciding the sale price of the weapons), and the degree of control and authority he exercised over Jerry Tovar and Galindo.

Jose Tovar contends that other facts suggest that it was Jerry Tovar who was responsible for the firearms sales. Jose Tovar asserts that the PSR indicated that all three men—Jose Tovar, Jerry Tovar, and Galindo—negotiated the purchase of the weapons. This is incorrect; the PSR states that Jose Tovar "provided the [source with] photographs of the weapons and the two negotiated the purchase fee of said weapons." Jose Tovar also points out that four of the six weapons being sold were owned by Jerry Tovar and that the weapons had been buried at Jerry Tovar's house.[2] The fact that Jerry Tovar

---

[2] Jose Tovar's argument appears to be, in part, that he should be sentenced only for the weapon he owned rather than for all six of the weapons that were sold (which also included four weapons that were owned by Jerry Tovar and one that could not be traced). This argument is foreclosed by Jose Tovar's guilty plea, in which he acknowledged possession

also had possession of the firearms, however, does not rebut the evidence suggesting that Jose Tovar had a managerial or supervisory role over the firearms sale.

Jose Tovar also argues that in determining that a managerial role enhancement applies, the district court incorrectly considered his role in the uncharged narcotics conduct. We distinguish the argument he made in the district court and in his original brief on appeal from the argument he makes in his reply brief. In the district court and his original brief, he argued that there was insufficient evidence to support his involvement in the drug activity and that the fact that he was not indicted for a drug offense shows that he could not have been a supervisor in the overall organization. In his reply brief, however, he also argues that because the drug trafficking conspiracy was separate from the underlying offense of selling or possessing weapons, it was error under the Guidelines to consider drug activity as part of his conduct relevant to sentencing. Because this latter argument was not raised until his reply brief, it is waived, and we do not address it here. *See In re Katrina Canal Breaches Litig.*, 620 F.3d 455, 459 n.3 (5th Cir. 2010) (holding that arguments not presented in an appellant's opening brief are waived).

Turning to Jose Tovar's argument that there was insufficient support of his involvement in the uncharged narcotics conduct, we note initially that, as stated above, the evidence directly relating to Jose Tovar's involvement in the firearms sale was sufficient to apply a managerial role enhancement. In any event, we also conclude that there was sufficient evidence to find that he was

---

of all six of the sale weapons, as well as two other weapons that were seized from his home. *See United States v. Flores-Sandoval*, 94 F.3d 346, 349 (7th Cir. 1996) (holding in the context of a sentencing enhancement challenge that "by stipulating to the conduct in the plea agreement, [the defendant] has waived any claim that he did not engage in that conduct").

involved in the uncharged narcotics activity.  We give little weight to Jose Tovar's argument that the decision not to charge him with a drug crime shows that he did not break any drug laws.  In contrast to a criminal prosecution, the government need only prove uncharged conduct at sentencing by a preponderance of the evidence.  *Cf. United States v. Faust*, 456 F.3d 1342, 1347 (11th Cir. 2006) ("[R]elevant conduct of which a defendant was acquitted nonetheless may be taken into account in sentencing for the offense of conviction, as long as the government proves the acquitted conduct relied upon by a preponderance of the evidence." (quotation marks and citation omitted)).  Jose Tovar also asserts that he purchased his condominiums and trucking business using legitimate assets.  But even taking this as true, it does not rebut the facts showing that he used his property for criminal ends.  Furthermore, Tovar's "unsworn and self-serving denial of the allegations contained in the PSR at the sentencing hearing is not competent rebuttal evidence."  *United States v. Thompson*, 325 F. App'x 365, 366 (5th Cir. 2009).  Accordingly, Jose Tovar has failed to present or point to any evidence rebutting the extensive facts in the PSR implicating him in narcotics trafficking and demonstrating that he played a managerial role in the overall narcotics and weapons trafficking organization.

Lastly, Jose Tovar argues that the district court erred in adopting the facts in the PSR because those facts lack sufficient indicia of reliability.  He contends that the statements in the PSR identifying him as a leader of a drug-trafficking organization and director of the actions of Jerry Tovar, Galindo, Silva, and Carrillo were conclusory findings based on the unsworn statements of agents and, thus, were not supported by reliable evidence.  We have held that a district court may adopt the facts contained in a PSR without further inquiry "if those facts have an adequate evidentiary basis with sufficient

indicia of reliability and the defendant does not present rebuttal evidence or otherwise demonstrate that the information in the PSR is unreliable." *United States v. Cabrera*, 288 F.3d 163, 173–74 (5th Cir. 2002). "Bald, conclusionary statements," however, are not sufficiently reliable. *Zuniga*, 720 F.3d at 591 (quotation marks and citation omitted).

As support for his argument, Jose Tovar cites *United States v. Elwood*, 999 F.2d 814 (5th Cir. 1993), a decision holding that a PSR that "merely gave a recitation of the conclusions of the DEA and the prosecutor," and was entirely devoid of relevant facts, could not justify a managerial role enhancement. *Id.* at 817. *Elwood* is distinguishable, however, because the PSR in this case includes specific facts, supplied by federal agents, codefendants, unindicted coconspirators, and other sources supporting the conclusion that Jose Tovar supervised or managed at least one other participant in his schemes to possess and sell firearms. *See United States v. Vela*, 927 F.2d 197, 201 (5th Cir. 1991) (holding that a "district court may properly find sufficient reliability on a presentence investigation report which is based on the results of a police investigation"). Jose Tovar has not demonstrated that the facts in the PSR are unreliable.

In sum, we find that Jose Tovar has not shown that the district court clearly erred in finding under U.S.S.G. § 3B1.1(b) that he was a manager or supervisor of at least one other participant in the relevant criminal conduct. We also find that he waived any challenge that the relevant criminal activity did not involve five or more participants or was not otherwise extensive.

## IV.   CONCLUSION

For the foregoing reasons, we AFFIRM the district court's sentence.